Dolan v. The State.

---

DOLAN VS. THE STATE.

1. BILL OF EXCEPTIONS: *Marginal notes on.*
   Exceptions to an instruction must appear in the bill of exceptions; noting the objection on the margin of the bill where the instruction is copied, is not sufficient.

2. CRIMINAL LAW: *Homicide. Self-Defense.*
   When parties fight and separate and afterwards meet and one slays the other, he is guilty of criminal homicide if he could at any time from the beginning of the first to the end of the second difficulty have reasonably withdrawn from or avoided the difficulty without immediate danger to himself. One can not set up self-defense until he has done everything reasonable in his power to prevent, abandon and decline any further contest with his adversary.

3. SAME: *Competency of juror. Opinion formed from newspaper statements.*
   A juror stated on his *voire dire:* "I have read the statements of newspapers of the facts about the killing, and had an opinion

upon what I heard, and may have that opinion now. I can and will give the defendant a fair and impartial trial regardless of this opinion." HELD: A competent juror.

4. CRIMINAL EVIDENCE: *Evidence of witness before committing Court*

The testimony of a witness before a committing Court taken and written down in the presence of the defendant and his counsel and sworn to and subscribed by the witness, may be read as evidence against the defendant on the trial in the Circuit Court, where the witness is not a resident of the State and his personal attendance in Court cannot be enforced. (Eakin, J., dissenting.)

5. CRIMINAL PRACTICE: *Misconduct of Jury: Drinking liquor.*

Where it appears from affidavit for a new trial in a criminal case that the jury drank intoxicating liquor during the trial, the Circuit Court should set aside their verdict of conviction, unless it further appears from the testimony that the jury were guilty of no excesses or misconduct that could have resulted prejudicially to the defendant. (Eakin, J., dissenting from the concluding qualification.)

APPEAL from *Garland* Circuit Court.

Hon. F. T. VAUGHAN, (on exchange) Circuit Judge.

*G. W. Murphy* and *W. N. Morphy* for appellant.

In cases of misconduct by the jury of the degree and character here shown, both principle and authority require the verdict to be set aside, at any rate, unless it be clearly shown that the defendant was not prejudiced thereby. *Cornelius v. State,* 7 *Eng.,* 784; *Coker v. State,* 20 *Ark.,* 53; *Collier v. State,* 20 *Ark.,* 36; *McKenzie v. State,* 26 *Ark* , 334; *Thompson v. State,* 26 *Ark.,* 323; *Wood v. State,* 34 *Ark.,* 341; *Early v. State,* 1 *Tex. App.,* 248; *Westmorland v. State,* 45 *Ga.,* 225; *Davis v. State,* 35 *Ind.,* 476; *Woods v. State,* 43 *Miss.,* 468; *Johnson v. Root,* 2 *Cliff.,* 108; *Creek v. State,* 25 *Ind.,* 151; *People v. Symonds,* 22 *Cal.,* 348; *Madden v. State,* 1 *Kan.,* 340; *Leighton v. Sargent,* 11 *Foster* (*N. H.*), 119; *Thompson's Case,* 8 *Gratt.,* 637; *People v. Douglass,* 4 *Conn.,* 26; *Commonwealth v. McCaul,* 1 *Virg. Case,* 271; *Jones v.*

Dolan v. The State.

*State*, 13 *Tex.*, 168; *State v. Baldy*, 17 *Iowa*, 39; *State v. Bullard*, 16 *N. H.*, 139; *State v. Andrews*, 20 *Conn.*, 100; *People v. Backus*, 5 *Cal.*, 275.

*C. B. Moore*, Attorney General, for the State.

The fact that the jury were guilty of misconduct is not a sufficient ground for a new trial unless it appears that the defendant was prejudiced thereby, &c. 2 *Wharton*, 3147; *State v. Upton*, 20 *Mo.*, 397; *Rowe v. State*, 11 *Hump.*, 491; *Pope v. State*, 36 *Miss.*, 131; *Stone v. State*, 4 *Hump*, 27; *Davis v. State*, 19 *Ill.*, 74; *Thompson v. Com'th.*, 8 *Gratt.*, 637; 6 *Ark.*, 535; 20 *Ib.*, 36; 26 *Ib.* 323; 28 *Ib.*, 155; 29 *Ib.*, 248; 33 *Ib.* 180; 34 *Ib.*, 341; 35 *Ib.*, 118; *Ib.* 639; *Jones v. State*, 16 *Cent. L. J.*, 409; 2 *Gra. & Wat.*, *New Trial*, 43, 48, 49, 50, 564 to 571.

*Jno. M. Harrell*, also for the State.

Cites *Jones v. State, sup;* 28 *Ark.*, 165; 34 *Ark.*, 345; 35 *Ib.*, 642-6.

ENGLISH, CH. J. The indictment in this case alleged in substance that John W. Dolan, on the 25th of December, 1882, in the county of Garland, did feloniously, wilfully and with malice aforethought, and with premeditation and deliberation, kill and murder Joseph Lefler, by then and there shooting him with a pistol loaded with gunpowder and leaden bullets, etc.

The indictment was returned into court by the grand jury on the 7th of February, 1883, and on the 12th of the same month, the accused having been duly served with a copy thereof, was arraigned, pleaded not guilty, and a jury was impannelled. The trial was concluded on the 16th of February, when the jury returned into court the following verdict:

" We, the jury, find the defendant guilty of murder in the second degree, and eleven of the twelve recommend him to

the mercy of the Court, leaving the Court to assess the penalty.

H. A. BALLENTINE."

A motion for a new trial was overruled; the Court sentenced defendant to imprisonment in the penitentiary for ten years. He took a bill of exceptions and prayed an appeal, which was allowed by one of the Judges of this Court.

The attorneys for appellant have said but little in their brief about the merits of the case, relying mainly upon the alleged misconduct of the jury for a reversal of the judgment. We have, however, considered and will notice all of the assignments in the motion for a new trial.

I. There was the usual assignment in the motion that the verdict was against the law and the evidence.

There was evidence conducing to prove that between nine and ten o'clock of the morning of the 25th of December, 1882, (Christmas day) appellant, commonly called *Shang* Dolan, was in a brawl, in the city of Hot Springs, with Joseph Lefler, a saloon keeper, and two other persons, who beat him, Lefler striking him several severe licks with a stick. Appellant seems to have been armed with a drawn pistol, and his assailants were attempting to disarm him. They were, perhaps, all under the influence of liquor. The particulars of this quarrel are not accurately stated by the witnesses, but no doubt appellant was provoked and angered by the beating he received, and felt revengeful toward Lefler for striking him with a stick, and inflicting injuries upon his face and head, and he did not choose to resort to law for redress.

There was also evidence conducing to prove that between four and five o'clock of the evening of the same day, appellant went down Malvern Avenue armed with a pistol, looking into saloons, hunting Lefler, and indicating a hostile purpose toward him.

Dolan v. The State.

When he reached Church street, which crosses Malvern Avenue, Lefler was coming up the street, drunk, unarmed, and accompanied by two other persons. On approaching Lefler appellant's pistol (a revolver) went off in his pocket, the ball entering the ground near his feet. He then drew the pistol from his pocket and shot Lefler, the ball entering his left side between the seventh and eighth ribs, and passing out near his right hip. He fell, and after he had fallen to the ground appellant fired a second shot at him, and then walked off. Lefler was carried to a house and died shortly after.

Such is the substance of the case made by the witnesses for the State.

On the part of the defense it was proved that Lefler had threatened appellant, and an attempt was made to prove that he was armed, and put his right hand to his hip, before he was shot, as if to draw a weapon, and that after he had fallen one of the men who accompanied him picked up from the ground a pistol, or something resembling a pistol. But the decided weight of evidence is that he was unarmed, and making no hostile demonstration when shot by appellant. That he was a quarrelsome man and of loose morals was proved. It was no doubt because of the beating he had given appellant in the morning that the jury returned a verdict of murder in the second degree, and recommended appellant to the mercy of the Court in fixing the penalty.

No one familiar with text-book criminal law can read the testimony disclosed in the bill of exceptions and pronounce the verdict to be against the law and the evidence.

II. The second assignment was that the Court misinstructed the jury, and the third that the Court refused to properly instruct the jury.

These assignments are general and point to nothing.

The bill of exceptions shows that the prosecuting attor-

Dolan v. The State.

ney moved seven instructions for the State, which the court gave. That five instructions were asked for appellant, and given, and that the court gave a general charge to the jury. The bill of exceptions fails to show that any one of the instructions given for the State, or any part of the general charge of the court was objected to by the appellant or his counsel.

The general charge of the court defined, fairly alike to the State and the prisoner, murder in the first and second degrees, voluntary manslaughter, and the law of self defense, and left the jury to consider and weigh the facts in evidence, the credibility of witnesses, and fix the grade of homicide, resolving doubts in favor of the accused.

There is a note in the margin of the seventh instruction given for the State—"Objected to, objection overruled, to which defendant excepted"—but when this marginal note was made or by whom, is not shown. The bill of exceptions fails to state that any objection was taken to this instruction; and if any had been taken, and overruled it was the province of the bill of exceptions to show it. *Ferguson et al v. Farguson et al.*, 38 *Ark.*, 238.

1. BILL OF EXCEPTIONS: Marginal notes on.

It was unobjectionable, however. It is on the law of self defense, and in these words:

2. Criminal Law. Homicide. Self-defense.

"If the jury believe from the evidence, that the defendant could have, at any time, from the beginning of the first difficulty to the ending of the second or last meeting between himself and deceased, when deceased was killed, reasonably withdrawn from or avoided the difficulty without immediate danger to himself, and failed to do so, he could not justify the killing by self defense. A man can not set up self defense until he has done everything reasonable in his power to prevent, abandon and decline any further contest with his adversary."

Dolan v. The State.

A similar instruction was approved in *Fitzpatrick v. State*, 37 *Ark.*, 252.

3. COMPE-
TENCY OF
JUROR:
Opinion
tormed from
newspaper
statement.

III.   The sixth assignment was that "the Court erred in declaring competent and qualified to serve upon said jury the following members :   B. W. Goode, H. A. Ballentine, W. A. Moore, M. Drysdale and Henry Durham, who had formed and expressed severally, opinions as to the guilt of defendant, and who were incompetent and unfair jurors, as was shown by their answers touching their incompetency."

The bill of exceptions states jurors Goode, Ballentine, Moore, Drysdale and Durham, on being examined as to their qualifications to sit as jurors each answered and said :   "I have read the statements of newspapers of the facts about the killing of Joseph Lefler, and had an opinion on what I heard, and may have that opinion now, I can and will give the defendant a fair and impartial trial regardless of this opinion."   The defendant submitted that the jurors were incompetent, but the court ruled them to be competent, to which ruling defendant excepted, &c.

Now, when news-papers are abundant in towns and cities, and hasten to ventilate homicides, and to guess at conjecture or facts, and volunteer chimney corner opinions for law, if citizens were rendered incompetent to serve as jurors by reading such newspaper articles, or by forming opinions from mere rumor, it would be difficult to make up juries of intelligent persons, in many communities, for the trial of such cases.

The court did not err in deciding the above jurors to be competent.   *Wright v. State*, 35 *Ark.*, 646.

IV.   The fifth assignment was to the effect, that Charles P. Murphy, Frank Fountaine, Jackson Matthews, Hill Randolph and other members of the jury, were at the time of their selection prejudiced against defendant, and had severally expressed an opinion to the effect that he ought to be con-

victed and hanged, and suppressed that fact when examined touching their qualifications, for the purpose of being taken on the jury, &c.

It is sufficient to say of this, that it is a mere statement in the motion for a new trial, and unsustained by anything in the record.

V. The seventh assignment was that the court erred in permitting the State to read in evidence the desposition of Fred Wright, whom defendant had no opportunity to cross-examine.

4 CRIMINAL EVIDENCE, of witness before committing court.

Before reading in evidence this deposition, the State proved that Fred Wright was sworn and examined before the committing magistrate, in the presence of appellant, who had counsel, and an opportunity to cross examine; that the testimony of the witness was taken down in writing at the time by the clerk of the magistrate, sworn to and subscribed, &c. That Wright was a resident of Texas, and had returned to that State after his examination, and remained there; that a subpœna had been issued for him, and returned not found by the sheriff.

In admitting this deposition, the Court below followed the decisions of this Court. See *Shackelford v. State*, 33 *Ark.*, 539, and cases cited.

VI. Nothing is found in the bill of exceptions to sustain the eighth assignment, that the Court admitted other incompetent testimony on the part of the State, against the objection of defendant. It is not good practice to make an assignment so general, and indefinite, pointing to no particular testimony as having been erroneously admitted by the Court.

VII. The fourth assignment contains two specifications, and the second will be noticed first. It is, that during the trial, and especially while defendant's counsel was arguing the cause in his behalf, reading and commenting upon the in-

instructions of the Court, and the evidence, Charles P. Murphy, one of the jurors, was asleep in the jury box, and paid no attention to the argument.

In support of this assignment the affidavit of *W. N. Morphy, Esq.*, one of the attorneys for appellant, was appended to the motion for a new trial. He stated that in the afternoon of February 16th, while *G. W. Murphy, Esq.*, one of his associate counsel, was addressing the jury, summing up the evidence, and expounding the instructions given by the Court, Charles P. Murphy, one of the jurors, was asleep in the jury box, absolutely oblivious to what was taking place in the court room. That affiant saw his Honor, the presiding Judge (Judge Vaughan) direct Jackson Matthews, a fellow juror, to wake up juror Murphy, which he did by touching him, and shaking him. This was the first affiant had seen of the juror sleeping. A similar affidavit was made by *George Townsend, Esq.*, also counsel for appellant.

The State took and read the affidavit of the juror Jackson Matthews, who stated that he occupied a seat in front of his fellow juror, Charles P. Murphy, and while George W. Murphy, Esq., was addressing the jury on behalf of defendant, his Honor the presiding Judge called the attention of affiant to said juror Murphy, whose eyes were closed, and directed affiant to touch him, which he did, and the juror at once gave attention to the speaker. Whether he had closed his eyes for sleep or not affiant did not know.

Charles P. Murphy, the juror accused of having been drowsy, was examined on oath in open court, on the hearing of the motion for a new trial, and stated that while George W. Murphy, Esq., was addressing the jury in the afternoon of February 16, 1883, he was leaning on the shoulder of a fellow juror, and asleep about half a minute. That the juror raised his shoulder so as to wake him, and about the same time Jackson Matthews, another juror, in front of him,

Dolan v. The State.

touched him, and this was the only time he was under the influence of drowsiness. That he was positive that he heard every word that Mr. Murphy addressed to the jury in his argument in behalf of defendant.

So it seems that not much of the eloquence of the learned advocate was wasted upon the drowsy juror.

VIII. The first specification under the fourth assignment, and the last point in the case, and the one most relied on for reversal, is: "That the jury, during the trial, drank often of intoxicating liquors, and some members thereof kept intoxicating liquors constantly with them, and drank often of them, frequently while the trial was in progress, and pending the argument of the cause, without any procurement or consent of the defendant." 5. MISS-CONDUCT OF JURY: Drinking liquor.

In support of this specification, the affidavits of W. W. Taylor, Wm. J. McTague, Wm. Burke, Andrew Brown, W. N. Morphy and Walter Graham were filed.

On the part of the State were taken the counter affidavits of D. O. Butterfield and Job Richards, the bailiffs who had the jury in charge, and of ten of the jurors, the other two having left the city, and oral testimony was taken in Court, on the hearing of the motion for a new trial.

W. W. TAYLOR stated, in substance, that on the 14th of February, 1883, sometime after 10 o'clock, P. M., he saw the jury in the saloon of W. J. McTague, and they were drinking intoxicating liquors at the bar; some drank three times severally. That the intoxicating liquors so drank were beer and whiskey. The jury were together, and in charge of an officer, whom he supposed to be a deputy sheriff.

W. J. McTAGUE stated that he was the proprietor of Mc-Tague's saloon, in the city of Hot Springs, and some time after 10 o'clock P. M. of the 14th of February, the jury in Dolan's case came to his place of business in charge of deputy sheriffs Prichard and Butterfield, and drank whiskey,

beer and other intoxicating liquors at the bar—some of them drank three glasses each. He was acquainted with nearly all of them, and waited on them.

*Wm. Burke* stated that during the 14th, 15th and 16th of February, he was at the restaurant of Joseph Mazzia on several occasions when the jury in Dolan's case took meals there in charge of deputy sheriffs Butterfield and Prichard, and saw all of them while eating, drink beer or whisky. On the 16th, about 8 o'clock P. M., he saw them eat supper there, and at this meal they all drank intoxicating liquors. Mr. Brown, Mr. Jackson, Mr. Morphy, Mr. Murphy, Judge Vaughan and prosecuting attorney Henderson were eating supper there at the same time, but he did not know that these parties, or any of them, saw the jury drink intoxicating liquors, but at the same time he thought everybody at the supper drank either wine, beer or whiskey.

*Andrew Bruor* stated that he was at the same supper, and his impression was that every member of the jury drank beer or whisky while eating, which were ordered from Mazzia's saloon next door to the supper room.

*W. N. Morphy* (of counsel for appellant) stated that on the 15th and 16th of February,, he took his meals at Mazzia's restaurant, and the jury in Dolan's case ate several meals there during that time, and that at nearly every one of said meals, the members of the jury drank intoxicating liquors, beer or whiskey. That at supper on the 16th of February, after the cause had been submitted to the jury, he saw each and every one of them drink intoxicating liquors. That he saw W. A. Moore and Hill Randolph, two of the jurors, drinking intoxicating liquors at the bar of Mazzia's saloon, separate and apart and out of sight of the other jurors.

That in the afternoon of the 16th of February, and after *W. N. Morphy,* one of the attorneys of defendant, had closed

his address to the jury, and while the jury were permitted to retire for a few minutes, he saw B. W. Goode and Hill Randolph, two of the jurors, drinking whiskey from a flask which one of them produced from his pocket. Then one or both of them requested affiant to indulge, which he declined.

That on several occasions during the progress of the trial, and while the jury were permitted to retire for a few minutes, he saw a flask of whiskey produced by some one of the jurors, from which several of them drank.

*Walter Graham* stated that he was night clerk at the Gwinn House, and was at that hotel on the night of February the 14th. That the jury in Dolan's case slept in two rooms of said hotel on that night. They came there about midnight. He showed them their rooms, and waited on them after they came. When they came there, many of them were under the influence of liquor, some of them quite drunk. After they went to their rooms, they procured two quart bottles of champagne, and a bottle of cocktail made from whiskey and other things. They were very boisterous during the greater part of the night.

This affidavit was sworn to before *W. N. Morphy*, Notary Public.

Such is the substance of all the *ex parte* affidavits filed with the motion for a new trial in support of the specification in question.

It will be observed that but one of the affiants (*Walter Graham*) stated that any of the jurors were intoxicated during the trial.

On the hearing of the motion for a new trial, he was sent for and examined in open Court in the presence of appellant and his counsel; and testified that he could not state that jurors were drunk at the Gwinn House on the night of the 14th of February; that they were having fun, and it

might have been their natural way of acting; that he was not well enough acquainted with them to tell; and that his affidavit filed in support of the motion for a new trial to prove misconduct of the jury was not true; that he did not know that the affidavit read as it did.

R. G. Davies, an attorney of Hot Springs, and M. W. Squires, proprietor of the Orleans House of the same city, were examined on oath in Court, and testified that they knew the character of Walter Graham, otherwise called "Red," for truth and immorality, and that his character was decidedly bad and they would not believe him on oath.

*H. A. Ballentine* and *Hill Randolph*, two of the jurors, stated on oath, that any statement to the effect that some of the jurors were on the night of the 14th of February, drunk or unduly under the influence of intoxicating drinks, on retiring to their rooms at the Gwinn House, and the statement of Walter Graham in his affidavit to that effect, were false.

They further stated that W. A. Morphy, one of defendant's attorneys, offered to furnish them stimulating drinks, one evening at the Mazzia eating house, while they were sitting on the trial of Dolan, and to pay for all that they would drink at that time, but they did not drink then or at any other time with him.

H. A. Ballentine, W. A. Moore, Thos. J. Evins, Hill Randolph and P. P. O'Daniel, five of the jurors, also stated on oath, that on the night that the jury were kept at the Gwinn House (and they were there but one night) they did not consider of their verdict, or talk the case over, but went there for the purpose of sleeping, and the case was not considered there. That in their judgment there was not a member of the jury under the influence of intoxicating liquor, and that if any member of the jury was drinking intoxicating liquors they failed to observe any effect or appearance of intoxication. That no outside influences were brought to bear, or

Dolan v. The State.

attempted to be brought to bear, on the jury at the Gwinn House, or elsewhere. That all noise made by the jury there, was matter of amusement. &c.

*D. O. Butterfield* stated on oath in substance, that he was one of the deputies of Sheriff Nichols, placed in charge of the jury during the trial, and continued in charge of them. That the jury at no time from the time they were impannelled and placed in his charge until discharged, were exposed to improper influences while out of the Court room, in charge of himself and other officers of the Court. That on the 14th of February, when the jury were about to retire to the rooms prepared for their sleeping apartment, about 10 o'clock in the evening of said day, accompanied by him and John Prichard, also a deputy sheriff, and in charge of the jury, several of the jurors expressed a desire to have a drink before going to their rooms, and in a body, were permitted to go into the saloon of W. J. McTague, accompanied by said officers, and ordered and received drinks, such of them as desired to drink, and a number of them, so attended, drank at the bar of said saloon, some of them whiskey, and some beer, and some of them may have taken more than one glass of beer, and others may have taken more than one drink of whisky, but all who drank there drank moderately, and no one drank so as to be unduly influenced thereby. That there were only three or four other persons in the saloon, and there was no conversation between them and the jury, &c. That at the time the jury visited the saloon the testimony on the part of the State had not been concluded, and none on the part of the defense had been offered. That was the first night the jury was ordered by the Court to be kept together, having before that time separated by consent of defendant and his counsel. That from the time the jury was ordered by the Court to be kept together until they returned their verdict and were discharged, there was no juror

on the panel under the influence in the least degree, to be perceived by affiant, of intoxicating or other stimulants, but that all of the jurors, while on the jury, conducted themselves in all things with decorum, and were at no time exposed to improper influence whereby their verdict might be controlled or biased to the injury of defendant.

*Job Prichard,* the other bailiff in charge of the jury during the trial, corroborated the above statement of Butterfield.

He also stated that he was in charge of the jury on the occasion referred to in the affidavit of *W. N. Morphy* when *Walter Moore* and *Hill Randolph* were alleged in said affidavit to have been separated from the other jurors while in Mazzia's saloon. That he was present with and in charge of said two jurors Moore and Randolph, who had been compelled to retire temporarily, and that no one conversed with them on said occasion. That Moore and Randolph then and there took one drink and no more, and were not influenced thereby in any degree that he could perceive, and they were known to him to be sober citizens of the highest standing in the community, and that during the trial said jurors were never at any time subjected to any influence whatever prejudicial to defendant, &c.

*B. W. Goode,* examined in Court, stated that he was a druggist; that no member of the jury while trying the case was under the influence of intoxicating liquor, &c. That he was sick during the trial, and part of the time had a flask of brandy with him, of which he drank, on account of his sickness, a severe colic which he took after he was sworn as a juror. That the Court adjourned the trial for half a day, the afternoon of the 13th of February; he took medicine, and was able to return to the jury box in the morning of the 14th of February, but was not well, and continued to take medicine, and sent to his drug store for a flask of brandy, of

which he took a little from time to time as medicine. This was all the intoxicating spirits he had with him while on the jury.

(This was perhaps the *flask* which *Mr. Morphy* saw, and took to be whiskey.)

There was a general affidavit made by *Geo. W. Calby, Frank Fountain, W. A. Moore, Hill Randolph, H. A. Ballentine, Jackson Matthews, T. R. O'Daniel, Thos. J. Evins, W. B. Goode* and *C. P. Murphy,* ten of the jurors, (the other two, *Henry Durham* and *Mathew Drysdale* having left the city) to the effect that at no time, from the time the jury was directed by the Court to be kept together, in charge of an officer, under the admonition of the Court, was any juror allowed to separate from his fellow jurors unless attended by an officer, while another officer remained in charge of the jury; nor was any juror under the influence of intoxicating drinks or stimulants, or subjected to any other influence whereby they or any of them were controlled or biased in any degree to the injury of defendant, from the time they were selected and impannelled until finally discharged, within the knowledge or belief of affiants.

It was also proved in Court that the prosecuting attorney had sent a deputy sheriff for *Durham* and *Drysdale,* the two jurors who did not join in the above affidavit, and that one of them had left for Memphis after the trial, and the other could not be found.

Such is the substance of all the evidence before the trial Judge on the subject of alleged misconduct of the jury, in the use of intoxicating liquors, during the trial, when he heard and overruled the motion for a new trial.

His Honor, the presiding Judge, who saw what manner of men the jurors, the officers in charge of them, and the makers of affidavits, pro and con, were, could better judge of

Dolan v. The State.

the truth of the alleged misconduct, its probable extent, and whether it had any influence upon the verdict prejudicial to appellant, than we can, with nothing but the record before us.

If, as a matter of law, a verdict of conviction in a case of homicide, had to be set aside, because, during a protracted trial, some or all of the jurors managed to procure and drink intoxicating liquors, regardless of the extent and occasions of the drinking, and its probable effect and influence upon them in making up their verdict, the administration of public justice would often be defeated.

In *Palmer v. State*, 29 *Ark.*, 254-269, this Court condemned, as it has in all the cases, the drinking of intoxicating liquors by the jury, when engaged in the trial of a cause, but held that such irregularity alone would not be sufficient cause for setting aside the judgment of the Court below in overruling the motion for a new trial, after the Court, with all the facts and circumstances before it, and a personal knowledge of the habits and character of the jury, had refused to set aside the verdict on that ground.

In *Kee v. State*, 28 *Ark.*, 165, it was made ground in a motion for a new trial, that the jury were permitted to go into a drinking saloon and drink spiritous liquors during their deliberations. This was supported by affidavits from which it appeared that the jury visited a drinking saloon during their deliberations in the case, where they, or most of them, took a drink of spiritous liquor, the sheriff being with them, and paying for the drinks. The Court said: "It does not appear that in consequence of this, the prisoner did not receive a fair and impartial trial, and therefore it furnishes no valid reason for a new trial. This conduct, nevertheless, was very reprehensible on the part of the jurymen guilty of it, and especially on the part of the sheriff, and they should have been severely punished by the Court."

Dolan v. The State.

It was said in *Collier v. State*, 20 *Ark.*, 50: "Upon the subject of misconduct of the jury, the practice in this country appears to have resolved itself into the exercise of a judicial discretion, confining the motion for a new trial to the question of abuse, and invariably denying the application where no injury has resulted," &c.

In *Robinson v. State* 33 *Ark.*, 185, an accommodating bailiff furnished a juror, who claimed to be sick, with half pint of whisky, which he drank. The Court condemned the furnishing of the whisky, but said that it appeared that nothing grew out of it to the prejudice of the prisoner, and added that in case of necessity for spirits, the better practice would be to furnish them under the direction of the presiding Judge.

In *Thompson v. State*, 26 *Ark.*, 398, JUSTICE HARRISON said: "The conclusion to be derived from the former decisions of this court, and which seems to be well supported by the authorities, as to consequences of the misconduct of the jury, in cases of mere exposure to improper influences, we understand to be this: "Where evidence is adduced, and shows that the jury were not in any way influenced, biased or prejudiced by the exposure, the verdict will not be disturbed, but unless it is proved that it failed of an effect, the presumption will be against the purity of the trial, and the verdict will be set aside."

This rule was approved and applied in *Wood v. State*, 34 *Ark.*, 345, when the officer in charge of the jury took them to his drug store and treated them to whiskey, and all of them except two drank, &c.

If in this case, there had been nothing before the trial Judge on the hearing of the motion for a new trial, but the affidavits filed on behalf of the prisoner, he should, and no doubt would, have set aside the verdict. But the counter affidavits, and testimony taken in Court, exculpate the jury

from any excesses, or misconduct, ·that could have resulted prejudicially to appellant.

*Jones v. State,* Supreme Court of Colorado, March 16th 1883, reported in Central Law Journal, Vol. 16, No. 21, is very much like the case now before us.

In that case affidavits showing misconduct of the jury in the use of intoxicating liquors were filed. A thorough investigation was ordered by the trial judge and the testimony of jurors and others heard on the whole matter. From this testimony it appeared that during the progress of the trial (for murder) the jury procured and had sent to their room, about two quarts of whisky, of which several of the jurors drank, but no considerable quantity was drunk by any one. That several of them were accustomed to taking a dram every morning, and it was procured on this occasion without any thought of harm or legal consequence arising from its use.

The testimony of the jurors examined, as well as that of the bailiff in charge, was that no one was intoxicated in the least, but that on the contrary, every juror on the panel was perfectly sober at all times during the trial; and that neither their deliberations nor verdict were influenced or effected in the least by the use of the liquor partaken of. The trial judge refused to set aside the verdict, which was for imprisonment for life.

JUSTICE STONE, delivering the opinion of the Supreme Court said :

"Whether the use of intoxicating liquors by any one or more of the jury is sufficient cause for setting aside a verdict rendered by such a jury, has given rise to a contrariety of opinion by the courts. This difference seems to depend much upon difference of the time in judicial history, and somewhat upon differences in local prevailing sentiment. Under the English Common Law in early times, jurors

were treated with a rigor which is unknown in modern practice, and would not be tolerated if attempted. Jurors were confined in rooms, like prisoners, there to be kept without meat, drink, fire, or candle, unless by permission of the Judge, until they were all unanimously agreed, &c., &c.

"The time when this discomfort, if not torture, of jurors, was considered essential to securing a just and speedy verdict has long gone by. As to the use of liquors, the English authorities seem to hold that if the drink is not at the expense of the prevailing party litigant in the case, the verdict is not necessarily vitiated. The early cases in New York and particularly the case of *Douglass v. People*, 4 *Cowen* 36, laid down the doctrine that the use of intoxicating liquors, to any extent, vitiated the verdict.

"The case was followed by the early courts of several other States, including Texas, &c.; but the doctrine of these cases was overruled by the Supreme Court of New York in the case of *Wilson v. Abraham*, 1 *Hill*, 207.

"The cases which now hold most strongly to the doctrine laid down in *Douglas v. People, Sup.*, are the Iowa cases. In the case of *State v. Baldy*, 17 *Iowa*, 39, the court set aside the verdict on the sole ground that after the jury had retired in charge of the bailiff, one of the jurors, who was permitted to separate from the others for a necessary purpose, went into a grocery store for some tobacco, and while there drank *a glass of lager beer*, and immediately returned to the jury room. There was no evidence that the juror was in any way effected by this one glass of beer, any more than the tobacco which at the same time he was permitted to get and to use, but the court *per* Cole, J. in the opinion denominates it 'spirituous drink', and declares that the use of such liquors, 'in any degree' is in itself 'conclusive evidence, that the party on trial has been prejudiced. This decision

is based chiefly on that of *Douglass v. People,* and is follow-
ed by the case of *Ryan v. Harrow,* 27 *Iowa,* 494, notwith-
standing, that in the latter case it is admitted that *Wilson v.
Abraham* overruled all the former New York decisions to
the contrary, including that of *Douglass v. People.*

"The doctrine of these Iowa cases is opposed, not only to the
great weight of authority, as will be seen by the authorities
hereafter cited, but, as we think, opposed to sound reason-
ing. It must be borne in mind that the question we have to
deal with has nothing to do with the moral or social ques-
tions involved in the use of intoxicating liquors. If a ver-
dict is to be set aside for misconduct of the jury, it must be
for legal reasons alone.

"If by such conduct a party litigant, or in a criminal case
a party on trial, has been prejud ced, the verdict should be
set aside, for the law requires a fair and impartial verdict.
If the justness, soundness, or fairness of the verdict has been
impaired, or in any way vitiated, by the use of liquors by
the jury, such verdict should be set aside. But if no such
consequences be shown, or fairly inferable; if no juror was
intoxicated, or in any way, manner or degree affected in his
deliberations or judgment, for that reason, in such a case, is
the verdict to be set aside? How has the party on trial
been prejudiced or injured? The real question in the case
is, has the party to be affected by the verdict been preju-
diced by the conduct of the jury?

"The general rule as stated by Mr. *Wharton* in his work
*on Criminal Law,* sec. 3111, is that the verdict will not be set
aside on account of the misconduct or irregularity of the
jury, even in a capital case, unless it be such as might affect
their impartiality or disqualify them from the proper exer-
cise of their functions." In the case at bar, it does not ap-
pear that the misconduct complained of disqualified any
juror in the proper exercise of his functions in the least, or

Dolan v. The State:

in any degree whatever impaired the correctness or justness of the verdict, but on the contrary, the testimony to the point clearly contradicts even a presumption against the verdict.

"But it is said on the other hand that the only safety lies in the rigid rule of setting aside the verdict in every case where intoxicating liquors are used by the jury, regardless of whether the jury were affected by such use or not. We cannot assent to this proposition. Would such a rule prevent a repetition of like misconduct by future juries? We say no. And instead of safety there is a manifest danger in the rule, for it would hold out an obvious temptation, and furnish an almost certain opportunity to secure a new trial in every case, by the surreptious introduction of liquors into the jury room, and would tend to lessen the certainty of conviction in every criminal case.

"Such misconduct on the part of the jury certainly deserves strong condemnation and punishment, and the jurors who procured and drank the l'quor in this case were strongly censured, and likewise fined by the Court, but this is a matter entirely apart from the question of setting aside the verdict when its fairness is not impeached.

"We cite the following authorities in support of the views we have expressed upon the question: *State v. Cacnel*, 31 *N. J.*, 250; *Wilson v. Abrahams*, 1 *Hill*, 207; *Commonwealth v. Roby*, 12 *Pick.*, 496; *Gilmantor v. Ham*, 38 *N. H.*, 108; *Rowe v. State* 11 *Humph.*, 492; *Puritor v. Humphreys*, 6 *Me.*, 379; *Slater v. Upton*, 20 *Mo.*, 397; *Thompson's Case*, 8 *Gratt.*, 657; *Davis v. People*, 19 *Ill.*, 74; *Roman v. State*, 41 *Wis.*, 312; *Westmoreland v. State*, 45 *Ga.*, 282; *Kee v. State*, 28 *Ark.*, 165; *Richardson v. Jones*, 1 *Nev.*, 405; *United States v. Gilbert*, 2 *Summ.*, *U. S. C. C.*, 83; 3 *Wharton, Cr. L.*, sec. 3320."

Upon the whole record the judgment must be affirmed.

EAKIN, J., dissenting. I respectfully dissent from the opinion and judgment of the Court in this case.

I do not think the paper signed by Fred Wright, and witnessed by "S. Spillman," was properly admissible in evidence against the defendant upon the trial. It is dated the 28th of December, 1882, some months before the trial. It has no jurat nor authentication by any certificate or endorsement. The State had proved that Wright was present and had testified on the examination for commitment, and that the defendant was present and had the opportunity to cross-examine. It had further proved by A. Spillman, that he had taken down for the Justice the testimony of the witnesses in said examining court, and that the paper was the testimony of Wright, as he gave it, and as it was reduced to writing by the witness Spillman. It was further proved that defendant, in the examining court, was represented by attorneys, and that Wright resided in Texas and could not be found.

There is no provision in the law for depositions of witnesses to be used against a prisoner "*on his trial*" upon indictment, and upon the issue of guilt or innocence. In no other sense is the word trial used in the Constitution, with reference to criminal matters. It is *there* that he has the constitutional right "to be confronted with the witnesses against him." I have never been satisfied with the decisions of this Court, or any other, under similar constitutional provisions, which have held it sufficient that the prisoner may, at *some other time or place*, have had an opportunity to *cross-examine* the witness, when it was not his duty to answer at all. He is never required to answer unless presented or indicted. *Constitution* 1874, *Art.* 2, *Sec's.* 8 *and* 10. His right goes beyond the mere opportunity of cross-examination afforded out of court. He has the right to have the witness stand before him, face to face, *upon his trial,* in the

Dolan v. The State.

presence of his peers, and to have them observe the moral effect of this confronting. If a paper, taken down by what, after all, is a mere by-stander, and which is, in effect, mere notes of evidence, attested by no jurat, and authenticated by no officer—a paper not required by law to be made by any one—if that be admissible in evidence, upon the testimony of the one who made it, that it is a correct report, then we are drifting far away from all constitutional protection. It would be better and safer to disregard the constitional guarantees altogether, and allow the State to take depositions in criminal cases. The proceedings would be attended with more formality and caution, and an accused person might have time to prepare a well-considered cross examination. I do not think the paper in question had a single evidentiary feature, as a document. If Spillman had undertaken to testify from his own recollection what Wright had formerly testified, the case would be more in accord with the case of *Shackelford v. The State*, but I am free to say that I am and have been always dissatisfied with the doctrine of that case, and hope to see our rulings brought more into harmony with the true spirit of the Constitution. I do not think "certainty of conviction" the proper aim of criminal practice. I think it is a much more important object to give every citizen assurance that he will not and cannot be convicted unless upon clear proof, beyond a reasonable doubt, upon proper indictment, and with the due protection of all the guarantees of the Constitution. That is simple freedom and nothing else is.

In the next place the proof is beyond question that during the whole trial the jury were indulging in the free and unlimited use of intoxicating liquors. Laying "Red's" testimony altogether aside, although I think it has *some* confirmation, there is more than enough to be shocking to one who appreciates the importance and solemnity of the

duty which this jury was called upon to perform. Concede that they are good men and citizens, and that they were incorrupt, and that they were wholly uninfluenced by any interference of others—all of which is shown, in exculpation, yet the fact remains that they were drinking, and that heavily, as most men would suppose, from the number of times the drinks were repeated. I would lay no great stress upon the fact, if it stood alone, that they took their meals at a restaurant where liquors were furnished at the table, and finding them there, partook moderately during meals. Even that would, in their responsible position, have been imprudent, but it is not incompatible with a thoughtful and earnest consideration of the law and evidence in a case affecting life or liberty. But there was much beyond that. Liquors were ordered from an adjoining bar. The jury visited bars in a body, and drank repeatedly, as much, one witness says, as five times in one night. They visited the theatre also, and one of them kept a brandy flask in the jury room, from which it is said others were allowed to partake. And all this without the permission, or, as we must presume, knowledge of the Court.

The Court below refused the new trial because the bailiffs in charge and the jurors themselves testified that none of them seemed under any *undue* influence of drink. The facts as to the drinking are nowhere denied. The Hon. Circuit Judge was authorized to exercise his judgment, based upon the ordinary course of things in nature as shown by observation, and I think was mistaken in taking the exculpatory statements of the bailiffs and jurors as establishing conclusively that they were *not* affected by liquor. Doubtless they all supposed they were not, as they had not been drunk. But it is well known that ardent spirits at a point much short of external demonstrations of intoxication, cloud the judgment or render it hasty and im-

Dolan v. The State.

pulsive, destoying the capacity for patient thought; excite the emotional parts of our nature, and unfit the mind for that cool weighing of evidence and clear apprehension of instructions, which are so important to those who hold the scales in which are balanced the chances of life or death, or long incarceration with labor, shame and disfranchisement.

This Court, and we believe all other Courts, have been in the habit of disapproving such practices. But that amounts to nothing practical. " Brutem fulmen." It is a mere tribute to virtue. It is time that should stop, and the disapprobation take shape and bear fruit in the severe punishment of the bailiffs who permit it and jurors who practice it, and in setting aside verdicts thus rendered. It is a contempt of Court in the highest degree, and tends to the destruction of all confidence in judicial proceedings. For myself I cannot appreciate the importance of certainty of conviction, unless it be on satisfactory proof, to be weighed by cool heads, and hearts beating with calm, normal emotions. Bailiffs and others who are not pschycological experts, might be mistaken in their judgment as to the effect of limited quantities of whiskey upon the reasoning faculties. It is unsafe. Liquors should not be permissible to jurors at all, except in individual cases of sickness, and should then be furnished only under the directions of the Court, with safeguards against abuse. It is not prudent to allow a juror, subject to colic, to send for brandy at his pleasure, as one of these jurors did, and to treat his fellow-jurors, as is charged and not denied.

I am very clearly and earnestly impressed with the conviction that there should be a new trial in this cause.