## SPENCE *v.* STATE.

Opinion delivered January 13, 1930.

*Peyton D. Moncrief, J. B. Brice, A. G. Meehan* and *John W. Moncrief,* for appellant.

*Hal L. Norwood,* Attorney General, and *Robert F. Smith,* Assistant, for appellee.

KIRBY, J. This appeal is prosecuted from a judgment of conviction of murder in the second degree, with a penalty assessed of nine years' imprisonment in the penitentiary, against appellant for the killing of one Jed Wilsey, on an indictment for murder in the first degree.

Appellant pleaded self-defense, and it is conceded that, under the evidence, the jury would have been warranted in returning a verdict of murder or manslaughter, as well as not guilty.

Appellant contended that timber had been stolen from him, and that the deceased was interested in the stolen timber, and that on the day of the killing he went down to where a number of timber workers were living in house boats for the purpose of trying to employ one of them. He had previously spoken to Jed Wilsey about working for him; stated he went up to the house boat where Wilsey lived, and spoke to him and some other people nearby; that; while he was trying to adjust something in the motor boat, his wife, who was with him, suddenly cried, "Look out!" and he glanced up and saw Wilsey approaching with a pistol, and he dropped down in the bed of the boat and jerked up a shotgun and started firing; shot so fast that witness did not know the number of shots he fired; said he did not know where the shot took effect in Wilsey's body, and the State's testimony tended to show some of them struck him in the back and others in the side. Deceased was shot with small shot, bird or squirrel shot, and it was also shown that deceased had threatened the life of appellant.

The State's testimony showed that appellant came up to where the house boats were moored, in a motor boat, with his wife and another man. He asked if Jed Wilsey was there, and, being told he was, asked him if he was in charge of the timber. Wilsey replied that he was, and appellant said, "Come over here." Wilsey, coatless, dressed only in his shirt and trousers and unarmed, started over towards appellant's boat, and when he had gotten within about 15 feet of him, appellant presented a repeating shotgun, shot it empty, shooting deceased in the side and back as he turned to get away. Deceased fell on one of the boats, and his body was hanging off into the water. Appellant said to the others, "Let's get him out of the water," and, after first being assured by the others that they would not hurt him, he assisted, and the body was dragged back on the boat where the deceased died shortly.

The only errors assigned for reversal are the giving of instruction 7A, reading as follows: "The State is required to prove the material allegations in this indictment, and that beyond a reasonable doubt, and the material allegations are that this defendant, some time prior to the finding of the indictment in the Southern District of Arkansas County, Arkansas, killed the deceased, one Jed Wilsey;" and the misconduct of the jury in that one of the jurors, while the case was being considered became violently ill, and was allowed to be separated from the others after the court had ordered the jury to be kept together.

The instructions relative to the degree of homicide of which defendant might be convicted, were in narrative form, and there is no complaint that any of the others, or all of them, did not correctly declare the law. The jury was told that the burden was upon the State to prove all the material allegations of the indictment fully specified therein, beyond a reasonable doubt, and the law relative to reasonable doubt and the presumption of innocence was also fully declared.

The instruction complained of is not contradictory of any of the instructions given, correctly defining the different degrees of homicide, and instructing the jury that appellant could not be convicted of either of them, except upon proof convincing them beyond a reasonable doubt of his guilt. Neither does the instruction complained of attempt to set out all the elements of the different offenses, or contain any direction about how the jury should find. It could not have misled the jury to the prejudice of the defendant, since it only convicted him of murder in the second degree upon evidence showing him to have been guilty of, and conceded to be sufficient to have supported a verdict against him for, the higher degree of the offense charged—murder in the first degree—showing that the jury's consideration of the question was guided by the law, as correctly declared. The jury was directed to consider the instructions given,

as a whole, and if the instruction complained of was erroneous it was not prejudicial. *Zinn* v. *State,* 135 Ark. 374, 205 S. W. 704; *Greathouse* v. *State,* 166 Ark. 206, 265 S. W. 950; *Stotts* v. *State,* 170 Ark. 194, 279 S. W. 364; *Smith* v. *State,* 172 Ark. 164, 287 S. W. 1026.

It is next complained that the jury was allowed to separate after having been directed to be kept together by the court, in care of an officer; and, by amended motion for a new trial, that the sick juror was under the influence of narcotics to such an extent as to render him incapable of discharging the duties of a juror, which fact it was alleged was unknown to appellant before the rendition of the verdict. After the jury had been ordered kept together, and put in charge of a deputy sheriff, one of the jurors, Mr. L. F. Baker, became violently ill, and the judge, upon being notified, directed that a physician be called for the sick juror, and that he be also attended by a deputy sheriff, which was done, the remainder of the jury being kept together by the other officer in charge. The doctor visited the juror about 7 o'clock in the morning, and administered treatment for bowel trouble, giving him a hypodermic containing 1/4 grain of morphine, and left him a preparation of bismuth and paregoric to be taken. He stated that the juror was suffering no pain, and his mental condition was normal when he went back to service on the jury in the afternoon. The juror said he was feeling all right, and he was down to his place of business the next day, and informed the doctor, who called at his filling station for gas, that he was feeling all right. The doctor did not think the medicine given the juror would have had a tendency to put him in a dull and sluggish condition, and, if he had not thought the man was normal, he would not have let him continue to sit on the jury.

The record recites the judge stated: "Let the records show that Mr. Hughes, deputy sheriff, was in charge of the jury, and he called me about seven o'clock that morning in my room at the hotel and told me that

one of the jurors was ill, and that it was necessary for him to have a doctor, and I advised the deputy sheriff immediately to get up and get in touch with the sheriff, and get another deputy, if it became necessary that the sick juror have a doctor. I believe it was deputy Benton Gibson who told me that it was necessary to have another deputy to look after the sick juror. Attorneys Bogle and Moncrief were sitting on the porch at the hotel, and I asked them if there was any objections to having another deputy to look after the sick juror, and Mr. Moncrief, attorney for the defense, said that it would be agreeable with him.''

Joe Gordon, the deputy sheriff, stated he stayed with, and looked after, the sick juror, L. B. Baker, and that no one was permitted to talk with the juror during the time he was taking care of him. The evidence also shows that the other jurors were kept together by the officer, into whose charge they were given by the court. There was other testimony, also, showing that the sick juror, separated from the others, was not subjected to any outside influence that could have been hurtful to appellant.

It became necessary for the sick juror to have medical attention, and be separated from the others for that purpose, and he was required to be, and was kept in charge of a deputy sheriff during his separation from the jury.

Under these circumstances we think that the case does not come under the rule that such separation casts upon the State the burden of showing that no improper influence was brought to bear upon the juror during his absence from the jury, or that it was *prima facie* ground for a new trial, without any affirmative showing that the separated juror was not subjected to any noxious influence. In other words, the separation of the sick juror in charge of a deputy sheriff, for medical attention by direction of the court, from the other members of the jury pending the trial, and after the jury had

been ordered kept together by the court, was a proper exercise of the court's discretion, and could not be regarded a violation of the order requiring the jury kept together, and imposing on the State the burden of making an affirmative showing that the sick juror was not exposed to any improper influence. *Armstrong* v. *State,* 102 Ark. 356, 144 S. W. 195, Ann. Cas. 1914A, 734.

Moreover, an affirmative showing was made by the State that said juror was not exposed, or subjected to any improper influence during the separation. The sick juror, upon the resumption of the trial, returned into court with the others, and while it is true he sat in a rocking chair supported by pillows to make his position more comfortable during the remainder of the trial, there was no showing made that the juror was incompetent to proceed with the discharge of his duties. The doctor who was treating him testified that his condition was normal, and that the medicine administered as and according to directions would not have rendered him in any way incapable of discharging his duty properly. Neither does the verdict, rendered upon evidence that shows him to have been guilty, and which it is conceded would have supported a verdict of a higher degree of the offense charged, indicate any incompetence on the part of such juror. No objection was made by appellant (as should have been done if the juror's condition warranted it) to proceeding with the trial with the jury as constituted, because of the condition of the sick juror who had been treated by a physician, but this is attempted to be explained by his attorneys stating that they had no knowledge of the kind of medicine administered in the treatment until after the trial was completed. This court has held that no error was committed in denying motions for a new trial on the ground that a juror had the appearance of being asleep, or was asleep, during the progress of the trial. *Pelham* v. *Page,* 6 Ark. 535; *Dolan* v. *State,* 40 Ark. 454. See also *Braunie* v. *State,* 105 Neb. 355, 180 N. W. 567, 12 A. L. R. 658, and note.

We find no error in the record, and the judgment is affirmed.

Mr. Justice McHANEY dissents.