Carter *v.* The State.

## JACOB CARTER *v.* THE STATE.

CRIMINAL LAW. *Misconduct of jury. New trial.* A verdict will be set aside and a new trial awarded, where the officer in charge of a jury on a trial for murder, permits them to read a newspaper article about the trial of the case.

### FROM HAMILTON.

Appeal in error from the Circuit Court of Hamilton county. D. C. TREWHITT, J.

LEWIS SHEPHERD and W. L. EAKEN for Carter.

ATTORNEY-GENERAL LEA for the State

DEADERICK, C. J., delivered the opinion of the court.

Carter was convicted in the circuit court of Hamilton county, of voluntary manslaughter and sentenced to seven years imprisonment in the penitentiary of the State, and has appealed to this court.

The bill of exceptions embraces only the affidavits of defendant, some of the jurors, and others, which were read in support of the motion for a new trial, and counter affidavits introduced by the State.

None of the evidence adduced upon the trial, is contained in the record, and of course we presume it was sufficient to support the verdict.

The application seems, from the record, to be founded solely upon the imputed misconduct of the jury in re-

ceiving and reading newspaper notices of the homicide and incidents of the trial, which were not in evidence.

Some attempt is also made to show that there were improper communications between some of the jury and other persons. But the facts disclosed by the affidavits, do not support this charge. We have not been furnished with any brief, or memorandum, from either the prosecution or defense.

The trial began April 1, and ended April 4, 1882, and defendant's affidavit states that on the 2d of April an article appeared in the "Chattanooga Times," written or furnished by Mr. Everett, one of the counsel for the prosecution, purporting to give a "history of the homicide for which affiant was on trial," and "to give the facts of affiant's connection with said homicide."

The article is set out in the affidavit and is headed: "The Evans Murder—After four years of delay the accused murderer, is at last on trial." The article gives the names of the jury, and the counsel engaged in the cause, and then states Evans was killed while returning from a corn husking; that he was waylaid and received nearly one hundred shots in his body. That Carter (the defendant), three England brothers and John Goldstein, were suspected of having done the deed through mere wantonness, but the four last succeeded in escaping.

The article further states that the trial had been delayed for four years on account of the failure of Carter's father, who was one of the most important witnesses against him, to appear; and that he was arrested on at-

tachment and placed in jail six months ago, to secure his attendance.   A circumstantial account of the robbery of a train by the James gang, detailed by one of the gang, appeared in the same paper, and is set out in full,   Also a further account of the murder of Evans, appeared in the same paper the next day, 3d of April.

The proof of the publication of the articles substantially as stated, is satisfactory.   And if such publication was, in fact, in the hands of the jury, and read by tnem, or any of them, we think it would be sufficient reason for granting a new trial.   It is well established by repeated adjudications of this court, that the verdict of the jury must be founded alone upon the evidence delivered in open court in the presence of the judge and the parties: 1 Swan, 63; 6 Hum., 275; 1 Baxt., 241; 3 Wh., sec. 3136.

At an early day, it was held if the jury receive papers not submitted in evidence, and a conviction is had, whatever the papers may be, a new trial should be granted, unless defendant occasioned the error: 3 Wharton, sec. 3136, citing 2 Hale P. C., 308; 5 Mass., 405.   Subsequently this doctrine was modified in Massachusetts, and it was held that where a paper was taken out by the jury by accident, and it was shown that it was not opened, the verdict was not vitiated: 5 Pick., 296.   And where articles referring to the case on trial, were cut out of newspapers by the officer, and the papers were then handed to the jury, it was held that this was an irregularity in the officer, but did not vitiate the verdict: 3 Wharton C. L., sec. 3137.

Carter *v.* The State.

The question then, for our determination is, were these article, or any of them, in relation to this homicide, before the jury?

Defendant introduced, in corroboration of his own statement, the affidavits of Jas. L. Whiteside, V. S. Whiteside, Thomas Crews, E. A. Norris and Geo. W. Ochs. The first four named, being jurors in the case, and Ochs the person who published the article, or reported it for publication. Jas. L. Whiteside stated that the deputy sheriff who had the jury in charge, furnished them two copies of the "Times" of 2d of April. After cutting out the article heretofore referred to, in relation to the killing of Evans and the trial of Carter, and the arrest and imprisonment of his father as a witness, he handed the slips cut out to H. F. Rogers, who laid it, or them, on the counter of the cigar stand at the hotel where the jury were staying; that he, Jas. L., took up the slip and read it and handed it to another member of the jury. The article was the same headed the "Evans Murder." He states that on the next day, 3d of April, the officer purchased some copies of the "Times" of that date, containing an article about the defendant, that he cut this article out of the papers and tore it up, throwing the pieces down, and he, affiant, picked up some of the pieces, but could not place them so as to read the article.

V. S. Whiteside states that on the 2d of April, the officer bought some copies of the "Times" of that date, cut out the article referred to, and left the article lying on the counter in the office of the hotel;

that Jas. L. Whiteside, another juror, picked up the slip which had been cut from the paper, and affiant, and Jas. L., and several other jurors read it, while the trial was in progress; affiant also states that he picked up a "Times" of the 2d of April, from a table in the court room, which had not been cut, and read the same article in that paper. He and Jas. L. both state that they were not aware that there was anything wrong in reading that article while they were on the jury.

Thomas Crews says he saw the officer cut the slips from the "Times" of the 2d of April, and hand them to H. F. Rogers, and he saw Jas. L. Whiteside reading said slip, and his best impression is that jurors E. A. Norris and V. L. Whiteside also read it. Norris had the slips after the trial and showed it to affiant.

E. A. Norris says on 2d of April the officer having charge of the jury purchased several copies of the "Times" of that date, and cut out the article referring to the trial of defendant, and handed the papers to the jury; that one or more of the slips cut out were placed upon the counter of the hotel, and that Jas. L. Whiteside and several other jurors, got possession of said article or articles, and read their contents; that next day, the 3d of April, the officer purchased some papers of that date, containing an article about the prisoner's connection with the homicide, which he cut out of the papers, and tore up, and the pieces were picked up by said Jas. L. Whiteside, and preserved by him.

Ochs states that the facts published in his paper

were furnished by Everett, counsel in the prosecution.

Six other jurors, with more or less of positiveness, and the officer in charge states that the slips cut out of the newspapers were destroyed, and none of them were read by any of the jurors.

One of these jurors, in an explanatory affidavit, says he does not mean to say that the four jurors introduced by defendant, might not have seen, or read the slips, but if they did, he did not know it, and as to the other five jurors, their statements, might well, in like manner, be qualified.

Although the probabilities are, that all the jurors would have noticed the slips in the hands of their fellow-jurors; yet, as there were amongst them some five or six mutilated copies of the "Times" of the 2d and 3d of April, it is not incredible that a slip might have been read before them without attracting special attention—at all events, four of the jurors speaking from their personal knowledge, so testify. They are not impeached, only so far as the presumed contradiction as to the facts of other jurors and the officer, may be supposed to be an impeachment.

The officer says that he tore up the slips from the three papers furnished the jury on the 2d of April, and that he did not place any of them on the counter. Jas. L. says that the officer handed the slips to H. F. Rogers, who put them on the counter. V. S. Whiteside says the officer left the slips lying upon the counter. Crews said the officer handed the slips to Rogers. Norris says one or more of these slips were placed upon the hotel counter. Rogers says he·

did not put the slips on the counter, but his impression is that Phillips (the officer), laid one of them on the counter.

None of these witnesses speak of the officer tearing up and throwing away the slips of the 2d of April, and of Jas. L. Whiteside picking them up and trying to fit the pieces together. But they do speak of these things having been done on the 3d of April.

Under the well established rules of evidence, we are of opinion that the weight of it is in favor of the proposition that a part of the jury read the articles on the 2d of April commenting upon the case, and that the comments were calculated to prejudice the defendant. And it is well settled, if facts are illegally before the jury, which may have prejudiced the prisoner, he is entitled to a new trial.

The value of jury trial depends upon guarding jurors against any and every influence, other than such as arises from evidence legitimately before them.

We are of opininion, therefore, that the Circuit Judge erred in refusing a new trial, and his judgment will be reversed and the cause remanded for a new trial.


McFARLAND, J., delivered the following dissenting opinion:

I am constrained to announce my dissent from the opinion of the majority of the court in this case.

Conceding that the affidavits are sufficient to show that some of the jury read one of the newspaper ar-

ticles, I cannot see that we ought to assume that they were, or even might have been thereby prejudiced against the prisoner. I grant that every one accused of a crime is entitled to a fair and impartial trial, and to this end the trial should be by an unprejudiced jury, and alone upon the evidence introduced in open court, and where there has been any departure from this rule, the verdict should be set aside.

I do not discover anything in the newspaper article in question of an inflammatory character or calculated to prejudice the prisoner's case with the jury, especially if we assume that they possessed even a moderate degree of intelligence and honesty. The article contains nothing to indicate the drift of public opinion as to the prisoner's guilt, and nothing as to his character, calculated to create prejudice against him. It purports mainly to be a history of the progress of the trial, a matter about which the jury were certainly as well informed as the author of the article. If it purports to state any facts pertinent to the issue before the jury, they are certainly stated in very general terms. The jurors must be supposed to know that a newspaper reporter in an article of this character is not speaking from a personal knoweldge of the facts. Before they enter the jury box they take a solemn oath that they have not formed or expressed any opinion. They are again solemnly sworn to try the case upon the law and evidence. It is fair to presume that the witnesses having a knowledge of the facts are examined in court, where their testimony is subjected to the test of cross examination and argument of coun-

sel. The jury are universally cautioned by the presiding judge to determine the case alone upon the evidence, and to disregard all outside influences. After all this, to suppose that a jury could, in any degree, be influenced in their verdict by a newspaper article containing nothing more than the one in question, is to attribute to them a degree of weakness scarcely consistent with their fitness for their position. Besides, the defendant has not seen proper to take a general bill of exceptions, setting out the evidence upon which he was convicted, so as to enable this court to see whether his case was so doubtful as to admit of the scales being turned against him by so slight a weight.

The fact that the newspaper reporter obtained his information from one of the prosecuting attorneys, is of no consequence, as there is no reason to suppose that there was any purpose on his part to tamper with the jury or to influence them. It would be as easy to suppose that it was a device upon the part of the defense to obtain a new trial in the event of a conviction, but I see no ground for either supposition.

The right of the accused to an impartial trial should be faithfully guarded, but there is danger that in our anxiety to do so we may sometimes fail to render due protection to the public, and throw such obstacles in the way of the execution of the criminal law, as to greatly impair its efficiency.

I therefore respectfully dissent from the majority opinion.

COOPER, J., concurs in this dissent.