WILLIAM A. SMITH and WILLIAM J. REYNOLDS

*v.*

STATE OF TENNESSEE.

(*Knoxville,* September Term, 1958.)

Opinion filed July 27, 1959.

Rehearing denied September 3, 1959.

504

506

508

CECIL D. BRANSTETTER, Nashville, WILLIAM A. REYNOLDS, RALPH E. VINEYARD, Knoxville, for plaintiffs in error.

THOMAS E. FOX, Assistant Attorney General, for the State.

510

MR. JUSTICE BURNETT, delivered the opinion of the Court.

The plaintiffs in error were found guilty of the first four counts of a five count indictment charging them with (1) conspiracy to take the life of Davis Robertson and divers other persons, (2) a conspiracy to take the life of Thomas Copeland and divers other persons, (3) conspiring to commit a felonious assault with intent to commit murder in the first degree upon the body of Davis Robertson and divers other persons, and (4) conspiring to commit a felonious assault with intent to commit murder in the first degree upon the body of Thomas Copeland and divers other persons. Both of these plaintiffs in error were found guilty and sentenced to serve not more than ten years for each offense. Judgment was entered upon this verdict and the sentences were ordered to run concurrently.

In each count of the indictment it is alleged that the person whose life was sought to be taken and others were

"acting as agents, servants and employees and contractors, and employees of contractors and sub-contractors of and with a certain motor transportation firm known as B & S Motor Lines, Inc., * * *''. This is a quotation from the first count of the indictment but the other counts allege substantially the same. This allegation in the indictments is necessary to bring the proof of the alleged conspiracy within the confines of the indictment.

In the outset we feel that it is fair to say that in this large record of some 1800 pages of proof, 93 pages in the technical record and a 99 page brief and assignments of error, the case throughout has been one of the best tried cases from the standpoint of both the State and the defense that has been our privilege to read. It took more than a week to try the case and several days were consumed with taking proof and the argument of the motion for new trial wherein all of the jurors were placed upon the stand by the defense, and certain questions and facts hereinafter to be referred to were developed. The trial judge was unusually fair, patient and painstaking in the trial of this case from the standpoint of all parties.

Under the facts as developed in this record the jury were clearly warranted in finding facts as follows: (The overwhelming preponderance in this factual situation as developed in this record supports such a finding): A strike was called in Nashville by the Teamsters' Union at the B & S Motor Lines in early 1955. The strike was probably called off for a short time but under the proof it lasted from May 2, 1955, until October 16, 1955. During this period the plaintiff in error Smith had many uninvited contacts with the President of the B & S Motor Lines. A number of these contacts were late at night

when Smith would appear, at times, on the property of the B & S Terminal in Nashville. The record is probably without contradiction that on some of these occasions Smith used toward the President of this Company, and to his face, the most violent epithets and vituperative cursing that we have ever read. Smith in his testimony herein does not deny this fact but in effect admits it and says that the President likewise cursed him. His attitude toward this President is also shown by two or three instances of his demeanor and his actions toward this President, and of his threats toward this Company, if they continued to hire "ununion" employees to drive tractors and pull these large motor trailers or trucks belonging to the B & S Lines.

At the time this strike was going on B & S hired independent contractors and others to use their own cab or motor, that is, the independent contractors' cab or motor, to pull and transport these large trucks to different points and particularly from the terminal of the B & S Motor Lines in Nashville to its terminal in Charlotte, North Carolina. These actions of the plaintiff in error Smith were shown to have happened a number of times in and around Nashville.

In June, 1955, the B & S Motor Lines sent two of these large trucks, at different hours, from their Nashville terminal to their North Carolina terminal. One of these trucks left Nashville on Saturday, June 11th, and the driver and owner of the motor drove it to his home out near Manchester and parked the truck at a place some 6 miles away from his home. He went home and spent the night. Sometime during the next day which was Sunday, he left and drove through Knoxville on his way

to North Carolina. He arrived at a filling station in Knoxville which is just practically across the street from the Labor Temple where the offices of the Teamsters Union were located, at that time, at about 10:00 o'clock that night. This motor left there around that time and when just within Knox County and before it arrived at the Sevier County line the operator of this truck testifies that for some little distance, before the event hereinafter to be related occurred, cars had been following this truck —they did not pass as cars ordinarily did—and that just before he got into Sevier County this car, which was a two-toned red and white General Motors car (it was not known whether it was a Buick or a Pontiac), passed the truck and in a very few minutes a car came back toward them at a rather high rate of speed with his bright lights on and just as this car passed them a shot or shots were fired at this truck. It is certainly inferable that this car was the same one that had passed immediately before. This driver says when they got some three quarters of a mile away, at the top of a hill, they stopped and were not able to find where the truck was hit. Later when they got over into North Carolina it developed that one of the inside front tires (the truck carries dual tires in the front) had been shot into and the bullet that was found in this tire was taken out and turned over to the officers.

Later another truck of the B & S Motor Lines left Nashville, being pulled by a motor owned by an independent contractor and operated by one Copeland. This truck came through Knoxville and on out the same highway toward North Carolina. This truck was some hour or more behind the truck above related. The driver of this truck testifies that a similar red and white two-toned car passed them and then came back toward them with

their bright lights on and shot through the windshield of the truck, the bullet striking the steering wheel and ricocheting off in the truck cab. This bullet was recovered and identified in the evidence as a 38 caliber bullet. After this shooting into the truck, there were other shots likewise shot at the truck. All of this shooting occurred around midnight on Sunday, June 12, 1955.

The record shows without contradiction that the plaintiff in error Smith, who was the assistant business agent of this Union in Nashville, left Nashville sometime about midnight on Saturday night, June 11, 1955, arriving in Knoxville and registering at the Farragut Hotel about 6:45 A.M. Sunday morning, June 12, 1955; that he registered under an assumed name and parked the car which he drove in the garage of the Farragut Hotel in his own name; that the car that he was driving was a new red and white two-toned Buick which he had borrowed from someone in Nashville; that on the Sunday night around 10:00 o'clock, at about the time the first truck was at the filling station across from the Labor Temple, Smith received a call at the Farragut Hotel and went down to the garage to get his car; that he had some trouble in getting it because he had registered under a different name from that in which the car was in; that due to this delay he cursed a little and finally, when he got the car out (the attendant drove it out to the alley), he drove away very rapidly; that then within what the jury could have found, from the time he left there and went to the Labor Temple and on up the highway, this shooting could have taken place from this automobile. This automobile which was driven by Smith corresponded with the one that it was testified as the one from which the shots came and which was following these trucks.

On this same Sunday night at about 12:45 o'clock after midnight, Smith was admitted to a hospital in Maryville with a gunshot wound through the fleshy part of his arm near the elbow; this gunshot wound was made with a 38 caliber bullet; that Smith entered this hospital at that time and was hospitalized for some three or four days but that no one took him in the hospital as far as the record shows at the time. When he was able he was taken back home to Nashville.

The record also shows by a local florist that while Smith was in the hospital the local Union sent him flowers.

Smith refused to tell the doctor or law enforcement officers at the time how he got shot, merely telling them it was an accident. No one was mentioned by him or how this happened even though it was investigated by the Sheriff's office of Blount County and the law enforcement officers of the State.

Some two years after these happenings a woman who worked in the office at Knoxville of the local Teamsters Union testified before a Congressional hearing to certain facts. Upon learning of this the present indictment for conspiracy was brought against these parties. This woman testified herein that on Friday before this shooting occurred that the plaintiff in error Reynolds received a long distance call from Nashville and that he talked to plaintiff in error Smith. All she heard them say was "the Farragut". Of course the inference is that Smith was going to stay at the Farragut Hotel and was coming over to Knoxville. A few days after the shooting but while Smith was in the hospital at Maryville, Reynolds ordered her to have flowers sent to Smith but to merely

say on the card, "from a friend". About the same time, and after this Sunday night shooting, on Monday she says that Reynolds made the remark that there was some shooting the night before and if the bullet had not hit the steering wheel it would have killed one of these drivers. She also testifies as to the length of time that she worked for this Union which was prior to January, 1955, until November, 1956, and as to the time they moved their offices from Walker Boulevard to the Labor Temple. Their offices were in the Labor Temple in sight of this filling station at the time the foregoing events took place. This witness likewise states that there was a 38 caliber magnum pistol in the safe on Friday before these happenings on Sunday and that Saturday it was gone; that she and the plaintiff in error Reynolds and two other people had access to the safe. The record does not show what happened to this pistol. Reynolds and Smith, both of whom took the stand, do not tell what happened to the pistol or where it went. She described the pistol to the officers and an expert made a drawing of this kind of a pistol and she identified it as that kind (a magnum 38). This is the way they get the magnum pistol in the record.

Other officers who were experts in the matter testify as to the bullets that were found after this shooting; that they came with a 38 pistol and that the plaintiff in error Smith was shot with a 38 pistol. In other words the jury could clearly infer, and that is the only inference that they could draw from this evidence, that these shots into these trucks and the one that shot Smith were from the same pistol.

The plaintiffs in error each took the witness stand. It is the contention of Reynolds that the lady who worked

in the office and testified against him as to incriminating things above referred to, as to what he had said and his actions, that she was no more than a common prostitute. He says he knew that at the time that he was elected as business agent of the local union about January 1, 1955, he taking office on January 3, 1955, and all during the time that she worked there under him. He detailed very definitely as to how at one time someone else had made some uncomplimentary remark to her and he found her crying and she, so he says, then when he was trying to comfort her, seduced him. He says that he had intercourse with her at will from then on out. He likewise says that he did not fire her for this reason but that she was later fired for being short in her accounts. The jury had proof to the contrary and clearly found that these statements that he made against her were unfounded.

Reynolds says that on the Sunday before this shooting occurred that night that he took his mother-in-law to church (he did not take his wife because she was staying home with the babies), and that after church he went to the Labor Temple for a meeting which was to occur at 2:00 o'clock and that he was in this meeting for a minimum of 2 hours. Smith in his testimony says that the reason that he came to Knoxville, leaving Nashville after midnight Saturday and arriving in Knoxville at 6:45 A.M. Sunday morning, was to attend this meeting at 2:00 o'clock on Sunday afternoon. Smith says that he went to sleep in his hotel room and overslept and did not get to the meeting until it was nearly over with.

Reynolds says that after this meeting was over that he started to drinking and was drinking when Smith arrived after the meeting was over. They tell a story then

about going to a restaurant and getting something to eat, Reynolds still drinking while they were at the restaurant and then Reynolds taking Smith back to the Farragut Hotel where Smith says that he stayed until Reynolds called him at 10:00 o'clock that night.

Reynolds says that after he left Smith at the Hotel that he ran around over in Blount County after some girls and got more drinks, etc., and then that he came back to the Labor Temple and called Smith at 10:00 o'clock that night that he had these girls in Blount County and that was the reason that he called him so that Smith would come over and they would go over to Blount County to pick up these girls.

Both of these plaintiffs in error testify as to their regard for their wives and children and yet both in effect brag about their promiscuous activity with women wherever they went. Smith's excuse or reason for registering at the Hotel under an assumed name was that he did so so that he could have a woman there with him. He says that he called some woman after he got to Knoxville by the name of Viola (he did not remember her last name) but he could not get in touch with her and that this same Viola was a woman that he had picked up on the road months before on a trip to Knoxville; that he brought her over here. Both of these plaintiffs in error say that their purpose for going to Blount County on this night was to get a woman or women.

They both, plaintiffs in error, deny that they shot into this truck, did any shooting at all except as hereinafter related and both say that Smith was shot when they were on the trip to Blount County around midnight looking for girls who got off from work at 1:00 o'clock. They

say that Reynolds, when they were near Alcoa, had to relieve himself and (Reynolds says they drove off on a side road while Smith says they stopped on the shoulder of the road) that then Reynolds got out of the car and went to the back and yelled at Smith something about he believed he would shoot the taillights out of the car with this old gun. Smith says that he had to get out for a like reason and walked back that way and while they were there and Reynolds was fooling with this old gun that is the way he got shot. Smith says that he did not feel the shot at first but later as he got back in the car under the wheel that it began to pain him and he began to feel the blood running down his arm then he said something to Reynolds that he should not fool with that "damned old gun". After they had gotten back in the car Smith says he began to feel faint and he scooted over out from under the wheel and that Reynolds then got in the car and drove him to the hospital and let him out at the door of the hospital and he entered as has heretofore been detailed.

Reynolds says that Smith told him when he went into the hosiptal that he did not have enough money and for him to get in touch with another agent in Chattanooga to get him some money to pay the hospital bill because he knew what they would do with him when they got him in the hospital; that he did not let Reynolds go in the hospital because he was in a hurry to get in touch with this Chattanooga man and get the money and he did not think that it was anyone's business to know anything about who he was with.

Reynolds says that he then left Smith and drove to Chattanooga to the home of this other person and left

the Buick automobile that Smith had brought from Nashville which he had borrowed from his friend there to be cleaned up; that he took the Chattanooga man's car and did not come back through Knoxville but then went on to him home in Union County and then came back to his office in Knoxville on Monday morning following. Neither one of these parties at that time, even though it was being investigated by the officers of the State and officers of the County, would tell anyone as to how this shooting of Smith and these other things took place. None of the factual situation as developed herein was told. Apparently, from this record, it was not known until some 2 years after happening to the law enforcement officers.

Smith confirms Reynolds' statements about most of these things yet as to minor things he at times says that he has to disagree with Reynolds on them.

Smith owned two automobiles. He gives as his reasons why he did not drive one of his two automobiles to Knoxville was that this friend of his liked to drive a convertible and that he Smith had a convertible and that he loaned the friend the convertible and he drove the friend's brand new Buick to Knoxville, and that his other automobile was being used by his wife at that time to go to see a sick relative in Indiana.

Clearly under this factual situation the jury could and did conclude that the reason that Smith had this automobile some 200 miles away from its base and was using it on this night (from it did the shooting into these trucks and being shot himself in the process of this shooting) was an effort to form an alibi for him. The alibis and excuses that they make why these things happened certainly fall far short of sounding or ringing like the truth.

The far more reasonable and truthful sounding of the whole situation is that they were the parties in the car who did the shooting into these trucks.

■■ Clearly all of these things were questions for the jury to pass on, that is, the weight to be given the various statements of the various witnesses, the inferences to be drawn from their statements and the credibility to be given these witnesses. All of this was a jury problem. All of these things of course are foreclosed by this verdict. *Turner v. State,* 188 Tenn. 312, 219 S.W.2d 188. Here the defendants are presumed to be guilty and we do not consider the question of whether or not beyond a reasonable doubt but whether or not the evidence preponderates against this guilt. Clearly the evidence here does not so preponderate, the preponderance is otherwise under this factual situation.

■ The defense is obviously based on an alibi. One witness offered as to the time these plaintiffs in error were seen here in Knoxville on the night of this shooting if his statements are accepted as correct would make it next to impossible for these plaintiffs in error to have been at the scene of the crime at the time it is fixed. Others are offered along this line. It must be remembered that the defense of alibi, like any other fact in the trial of a criminal prosecution, must be clearly, certainly and fully established by the proof, and these fact things, that is, of an alibi, are left to the jury, with other proof in the cause. Of course the court and the jury on alibi questions look to these factual situations with great strictness and attention, to avoid being misled by them, as alibis are easily concocted and it is easy for an alibi

witness to be honestly mistaken about the particular times that these things happened.

██ This Court said in *Cole v. State,* 187 Tenn. 459, 215 S.W.2d 824, that alibi evidence and its corroboration is to be received with caution and is to be weighed and determined like any other evidence. This obviously is and must be a correct rule. We have very carefully read all of this alibi evidence herein and clearly feel that it does not preponderate against the finding of the jury herein. Of course the plaintiffs in error in their argument take the position that it is absolutely true and consequently the acts of which these plaintiffs in error are accused would be impossible for them to have committed. We think that the evidence though shows otherwise.

Obviously a case of this kind must be based on circumstantial evidence because people or those who enter into a conspiracy to do a criminal act as that herein do not enter into a written contract or get out in the open but it is done in a devious method and in an effort to try to cover up the guilt of those accused of such conspiracy.

██ The question of admission and the reliance on circumstantial evidence to establish questions of this kind are ably and interestingly discussed in Wharton's Criminal Evidence, 12th Edition, Vol. 3, Sec. 980, et seq. This work says, among other things, that:

"Circumstantial evidence may by itself be sufficient proof of the commission of a crime and sufficient proof on which to base a conviction."

This work further says (page 473):

"In the effort to guard against improper verdicts, it is commonly stated that in determining the sufficiency

of circumstantial evidence, (1) all the essential facts must be consistent with the hypothesis of guilt, as that is to be compared with all the facts proved; (2) the facts must exclude every other reasonable theory or hypothesis except that of guilt; and (3) the facts must establish such a certainty of guilt of the accused as to convince the mind beyond a reasonable doubt that the accused is the one who committed the offense."

We think that under the factual situation as developed herein these plaintiffs in error are guilty under this applicable rule. The facts as supported by the only reasonable inference to be drawn from these facts cause an unbiased mind to reach such a conclusion. Of course the inferences to be drawn from these things are questions for the jury and not for us. *Liakas v. State,* 199 Tenn. 298, 286 S.W.2d 856. When we see, as it appears here, that the evidence does not preponderate against such a finding we should not disturb the verdict on this question. *Cathey v. State,* 191 Tenn. 617, 235 S.W.2d 601.

In *Woodruff v. Hughes,* 2 Ga.App. 361, 58 S.E. 551, 553, that Court said:

"The law recognizes the intrinsic difficulty of proving a conspiracy * * * The conspiracy may sometimes be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances."

There are many cases supporting this statement and we know none to the contrary. From the factual situation herein certainly this conspiracy is tied together in such a way that it is inescapable under this record that these parties were parties thereto and guilty of the acts charged.

██ The books variously define conspiracy. The following taken from 8A Words and Phrases, Conspiracy, it seems to us is an acceptable and applicable definition of that term as applied to the facts of the instant case.

" 'Conspiracy' is said to be an offense known to the ancient common law, antedating the statute of Edward I; the most widely recognized definition of which declares a criminal conspiracy to consist of a combination between two or more persons for the purpose of accomplishing a criminal or unlawful act, or an object neither criminal nor unlawful by unlawful means, or, as it has been more concisely expressed, the combination of two or more persons to do something unlawful, either as a means or as an ultimate end." (Page 375.)

Under this definition there are literally hundreds of cases cited from most of the jurisdictions in the United States.

██ It is very earnestly contended in the assignments of error and brief, and was at the bar of this Court, that it was prejudicial error on the part of the District Attorney General to be allowed to ask prospective jurors on the voir dire if they knew Dave Beck, Jimmy Hoffa, or other high Teamster officials, on the theory that the questions were asked only for the purpose of prejudicing the jury against the defendants. We have read this volume, on the examination of the jurors on their voir dire, and certainly do not think that it bears this inference. A voir dire examination is for the purpose of advising counsel of the juror's qualification, interest, or bias, as a matter of fact, presupposing his statutory competence, that is, age, residency, etc. The subjacent purpose is to enable the exercise of one's peremp-

tory challenges. *Leach v. State,* 31 Ala.App. 390, 18 So. 2d 285. In this process, it has been held, and it seems to us fairly so, that proper fields of inquiry include the juror's occupation, habits, acquaintanceships, associations and other factors, including his experiences, which will indicate his freedom from bias. *People v. Pers,* 362 Ill. 298, 199 N.E. 812; *Watson v. City of Bozeman,* 117 Mont. 5, 156 P.2d 178; *United States v. Mesarosh,* D.C., 116 F.Supp. 345. Our case of *Gray v. State,* 191 Tenn. 526, 235 S.W.2d 20, is cited as authority in support of the contention here made by the plaintiffs in error. Upon again reviewing this case, *Gray v. State,* supra, we do not think that it and the reasoning there is applicable to the factual situation as shown by the record in this case. We accordingly must overrule this contention.

It is very ably and earnestly argued by the plaintiffs in error that there was prejudicial error committed by the District Attorney General asking the plaintiffs in error when they were on the witness stand, and other witnesses, if they did not take the Fifth Amendment before the Senate Rackets Investigating Committee in Washington, D. C., after objection to such question was made by defense counsel. The record does not disclose that the District Attorney General was allowed to continue to ask such questions before the jury after the question had been ruled on by the Court. The record shows that the District Attorney General asked the plaintiff in error Reynolds on cross examination whether or not he took the Fifth Amendment but immediately upon objection the jury was instructed to disregard the Attorney General's question to that effect.

526

■ On cross examination of the plaintiff in error Smith the Attorney General asked him if he had told any law enforcement officer or authorities the details regarding how his arm was shot. After this question was asked there are several pages of colloquy between counsel and the court. Objection was made to this statement on the theory that it was leading to the question of whether or not Smith had taken the Fifth Amendment before the Senate Rackets Committee in Washington. The trial court very ably guarded the rights of both plaintiffs in error to anything improper and sustained the objections to questions along this line, especially when it looked like the question might lead to something that was improper.

The trial judge's instruction to the jury to disregard this question and in not requiring the witness to answer the same prevented it from constituting prejudicial error. *Stokes v. State,* 64 Tenn. 619; *Marable v. State,* 203 Tenn. 440, 313 S.W.2d 451.

■ When the witness Freels, the young lady who had worked for the Union during the occurrence of the factual situation of what these men were indicted and convicted for, was asked what the plaintiff in error Reynolds said when he came to her home to talk with her about the case a short time before it was set for trial, she said, among other things, that he said he was advised by the Teamsters' Union to go before the Investigating Committee and take the Fifth Amendment. This was competent because it was another circumstance which the jury could consider to determine the guilt or innocence of the defendant Reynolds.

■ About two volumes of this large record are taken up with the evidence heard and argument on motion for

new trial. This evidence was the examination of various jurors and their conduct during the trial as well as the officers who had charge of them. It is very seriously argued and contended about how the jury was kept and that they were separated, etc., and that newspapers were allowed to be brought to their rooms and they read newspapers and saw newspapers on the street and listened to the radio and saw the television, etc. It is argued that it was error to have the jurors quartered in separate rooms in the hotel across from the Court House during the trial of this case. It is also argued that the jurors were permitted to use telephones in their rooms and that the jurors balloted on the verdict prior to the end of the case.

Each of the jurors, including the thirteenth juror, was examined by the plaintiffs in error relative to these matters. The jury officer, the assistant manager of the Hotel, maids and other employees of the Hotel were examined regarding these matters on this motion for new trial. The evidence taken from these witnesses was to the effect that the jury was quartered in four different rooms on the fifth floor of the Hotel. All of these rooms were within the view of the jury officer when he was in the Hotel corridor. The telephone circuits to these rooms were blocked so that members of the jury could only make calls to the Hotel desk and for room service. Some of the jurors listened to the radio. Most all of the jurors heard some of the television programs; one or two of the jurors heard news casts on the television and remembered seeing the two defendants on the television screen but did not remember hearing any news of any consequence relative to the defendants or the trial of the defendants. One juror said he read something about it but it was boring and did not see anything in the paper that he had not

heard all day, or something to that effect. Most all of the jurors saw the headlines in the Knoxville papers relative to these defendants and their trial as they entered and left the Hotel. The jurors were taken some three blocks up the street to a restaurant to eat and back and were allowed to take some exercise walks, etc., and taken out altogether to a place for a little exercise over the weekend. They were quartered together for some 7 or 8 days. None of the jurors was influenced by anything he saw or heard about these defendants except what they heard in the court room during trial. Every one of them says this and there is absolutely no showing on a careful reading and scrutiny of their testimony that there was any influence whatsoever rendered on any of these jurors by what they read or saw in the Hotel. Each one of them was asked specifically if when the bellboy delivered cokes, beer or what-not to them in their rooms if anything whatsoever was mentioned about the case and they all said specifically that there was not. There is no showing that anybody at all contacted these jurors. As some of them passed the news stand on the way in they stopped and bought a magazine or something of the kind. As they crossed the street naturally the news boys hawking their papers with the headlines on it, those things were shown, but it is shown absolutely that nothing influenced these jurors one way or the other. One juror very succinctly states the proposition as follows:

"I would like to say this, and that is with all credit to you and to these defendants and the attorneys, these defense attorneys. I never tried harder in my life to give a decision that I thought was just. This is the first time I ever had one. I tried to stay out of this. I just tried to do the best that I knew how under the circum-

stances. * * * This is in all honesty. I know to the best of my knowledge. * * I would say that nothing interfered with my thoughts or thinking in this case, whatever. I mean, anything that happened over there—I never listened to anything more intently or tried any harder in my life to get it right. This is honest. I believe that entire group tried hard.''

Each juror had a similar feeling, that is, that nothing that was seen or heard outside or while they were in the jury room influenced their verdicts in the slightest; that the only thing that the lawsuit was decided on was the evidence that they heard from the witness stand and the charge of the court.

This question about the misconduct of the jury and their separation, etc., among other things showed that after the case was decided the jury disbanded; that their rooms which they occupied at the Hotel were searched by counsel for the plaintiffs in error and certain newspapers were found in these rooms which contained headlines relative to the plaintiffs in error and the Teamsters' Union. Some of the jurors remembered seeing these, but by their actions, as above indicated, they were conscientious and made an honest effort to arrive at a fair verdict. This record shows that they were indeed a very high class group of gentlemen. The record fails to show that they balloted on the guilt or innocence of the defendants until after the case was submitted to them for that purpose. Some of them of course discussed it with each other during the progress of the trial.

Quite a lengthy argument and much authority is cited in support of the plaintiffs in error's assignments that the reading of these newspapers is error. The State

makes the contention that since none of the jurors was influenced by what they saw in the papers or any other acts complained of in this assignment of error that the verdict is valid. This assignment is based on such cases as *Carter v. State,* 1882, 77 Tenn. 440, and like cases, wherein the courts hold that if the account in the newspaper is prejudicial to the defendant and likely to interfere with his right to a fair trial, the reading of it by the jurors will be a ground upon which to have the verdict vitiated and a new trial granted. Other cases are cited by the plaintiffs in error in support of this proposition.

In the first place we would say that the Carter case was written by this Court many years before the Harmless Error Statute (1911) was enacted. (Section 27-117, T.C.A.) The overwhelming weight of authority is to the effect that the reading of a prejudicial article by the jurors may be a ground for a new trial but it can be overcome by showing that the jury was not influenced by the report irrespective of its contents. This was certainly done herein, that is, that the jurors were in no way influenced by any of these things that they read or saw. There are many authorities that support the proposition, too, that this does not constitute error when the court instructs the jury that they should decide the case on evidence heard in open court and to disregard this fact. That was the instruction herein.

A case along the latter line which has very similar contents in it to that in the present case is *Howell v. State,* 1952, 220 Ark. 278, 247 S.W.2d 952, 955. The court in this case after reviewing the headlines in the newspapers, etc., and quoting the charge of the trial court to the jurors said this:

"In view of the above it does not appear that any prejudice was shown to have resulted, but it does appear that the court's admonition to the jury was thorough and the court was correct in refusing to grant a mistrial. In the Dolan case [*Dolan v. State,* 40 Ark. 454], supra, it was said:

" 'Now, when newspapers are abundant in towns and cities, and hasten to ventilate homicides, and to guess at conjecture or facts, and volunteer chimney corner opinions of law, if citizens were rendered incompetent to serve as jurors by reading such newspaper articles, or by forming opinions from mere rumor, it would be difficult to make up juries of intelligent persons, in many communities, for the trial of such cases.' "

That is certainly an applicable comment which applies in modern times, and applies to the factual situation herein.

The Supreme Court of Illinois in the case of *People v. Malmenato,* 1958, 14 Ill. 2d 52, 150 N.E.2d 806, 813, after discussing at length and citing many cases ended up with this very apt and accurate statement:

"An accused is entitled to a fair trial and his rights must be zealously guarded by court and counsel, but a reversal is not indicated merely because a newspaper prints some statement derogatory of the defendant during the trial. To warrant a reversal, it must reasonably appear that the jurors, or at least some of them, have been influenced or prejudiced to the extent that they cannot be fair and impartial. Such evidence is lacking in this case."

Considering the Carter case, supra, in reference to newspaper articles, the case was written in 1882 and as we said before the Harmless Error Statute (Sec. 27-117, T.C.A.). We think that now, after an examination and reading of the record and the evidence here of these newspapers and things before the jurors, what the jurors said about it, that there is no error. This at least was harmless error and in view of this Statute (section 27-117, T.C.A.) we must go along with what this Court said in *Munson v. State,* 141 Tenn. 522, 524, 213 S.W. 916, when this was said:

"This statute forbids a reversal of any case coming to this court for any error in any part of the procedure below unless this court is of opinion, after an examination of the entire record, that the error complained of affected the merits. * * * (Citing authorities) It was declared in all of those cases, as well as others, that the merits of a criminal case is the guilt or innocence of the accused. Of course, there may be such a violation or disregard of some constitutional right of the accused, not affecting the merits, that would induce the court to order a new trial; but it is difficult to see how one who is guilty of the offense of which he has been convicted can justly complain at errors in procedure which had no direct or remote relation to the judgment rendered against them."

We cannot see any difference in the argument made under this question from one that might be made as to a challenge of the juror on the voir dire who states that he has read the newspapers, and based on these newspaper reports he has formed an opinion, or things of that kind. In such a case on their voir dire examination mere-

ly that a prospective juror has formed an opinion from reading these papers is not held to be a disqualification unless it is a fixed opinion which would require evidence to overcome. As to such a situation a Federal Court (*Union Electric Light & Power Co. v. Snyder Estate Co.*, 8 Cir., 65 F.2d 297, 301) had this to say:

"Based on this showing, counsel for plaintiff moved that the panel of prospective jurors be discharged. The motion being denied, counsel for plaintiff then moved that those jurors who had read the article be dismissed from the panel, and this motion was likewise denied. Peremptory challenges were then exercised, and there remained on the jury one juror who had read the headlines, one who had read half the article, and two who had read the entire article.

"Regardless of the character of the article, the first motion was properly denied because it asked for the discharge of the whole panel, while only certain of the members of the panel had read the article in whole or in part. The second motion was also properly denied because a juror is not disqualified from the mere fact that he has learned something of the facts, or of what are printed in a newspaper as the facts of the case."

Our case of *Manning v. State,* 155 Tenn. 266, 292 S.W. 451, supports such reasoning.

We think another reason why this assignment should be overruled is on direct examination the plaintiff in error Smith made a long speech to the jury, and among other things that he said was, and this was done voluntarily, not in response to any question, that he no longer answered questions for police officers and newspaper re-

porters because he had read in the paper that he was an ex-convict and that he had seen his picture in the paper with a big number across it which embarrassed his 10-year old son. There is nothing in the record to indicate that the headlines seen by the members of the jury during the trial of the case contained any remarks relative to the plaintiffs in error other than those contained in Smith's testimony.

Thus it is that we think this contention must be overruled.

In discussing the previous assignment of error, that is, the separation of the jury in the Hotel, we neglected to state that in a very recent case, that of *Steadman v. State,* 199 Tenn. 66, 282 S.W.2d 777, related questions to those herein discussed were considered by this Court and are likewise controlling here. In the Steadman case the jury was separated and one of the jurors was a woman who stayed in one place. They likewise saw television, etc., but we held in that case that it was shown that there was no prejudice to the defendant and thus that their separation as was shown there did not vitiate the verdict.

█ It is not an improper separation for the jurors to occupy different rooms in a hotel, or the like, when they are under the supervision of the officer appointed and sworn by the court for this purpose. See *State v. Shawley,* 334 Mo. 352, 67 S.W.2d 74; *Forester v. State,* 36 Okl.Cr. 111, 252 P. 861, and *Ramos v. State,* 120 Tex. Cr.R. 512, 48 S.W.2d 286 and others.

█ The District Attorney General asked each of the jurors on their examination on the motion for new trial whether or not these newspaper stories and other infor-

mation heretofore referred to that they had received in their hotel rooms affected the verdict and it was very strenuously objected to by counsel for the plaintiffs in error on the theory that this was allowing the jury to impeach its verdict. This was overruled by the trial judge and properly so for several reasons. In the first place all these jurors were put on the witness stand by the plaintiffs in error in an attempt to show what information, etc., had reached them during the pendency of this trial. After they were turned over to the District Attorney General these questions were asked.

 This is perfectly proper, if for no other reason due to the fact that they were put on by the plaintiffs in error in an attempt to show what had happened. The necessary inference in putting them on by the plaintiffs in error was to show that this had influenced the verdict, thus it is proper to show that it had not by their answer. In the second place this is not in effect impeaching their verdict. This is merely stating that when such and such had been brought before them that it did not influence them in the least, but they tried it on the law and the evidence as they had heard in court. In the third place, without more, the presumption is, of course, that the jury does decide the case on the law and evidence that they have heard under the supervision of the judge and at his direction. Thus it is when it is attempted to be shown that certain things outside of the evidence from that they heard on the witness stand was brought before them, as we referred to in our discussion of the voir dire on this question, it is to overcome any presumption that might be that this did influence their verdict. By reason of what was said it is entirely proper for the jury to state that it did or it did not influence

them. For these reasons we think that there was no impeachment of the verdict and that the evidence was proper.

■ It was ably argued and assigned as error that the trial court committed prejudicial error in not declaring a mistrial because of what is argued the juror Daniels said on his voir dire examination; that he did not let the parties know that he at one time had been a member of the Teamsters' Union. The argument is that this is propter affectum (on account of partiality) and that thus the juror was biased or partial either actually or that partiality must be presumed to exist by reason of his having been a member of the Teamsters' Union, and at the time that he was a member he had been fired and had a fight with one of the Teamsters. We have carefully read the examination on the voir dire and find that this discloses that this juror made no false accusations at that time. He testified in response to questions asked him that he had worked one time for Southern Dairies as a route supervisor and that he knew the plaintiff in error Reynolds on sight because of his work at Southern Dairies there with the members of the Teamsters' Union. He was asked on this examination if part of his duties as a supervisor involved dealing with the Union and his reply was: "At Southern Dairies, Yes." He was then asked did he deal with the Union and his reply was that as a supervisor he was not connected with them. This witness stated on this examination (he was at that time being examined on his voir dire for jury service) that he was a member of a union at that time but not the Teamsters' Union. On this the examination was apparently closed and it was concluded that he was acceptable.

There is nothing in this examination or his examination on the motion for new trial that shows that this man was biased or affected in any way by his former association or connection with the Teamsters' Union. Because he had once been a member of that Union does not affect him or make him biased just from that standpoint alone. It seems that if counsel had wanted to follow this matter further and had not been satisfied when they accepted this juror that they were in a far better position, that is, the plaintiffs in error being representatives of that Union to know whether or not the man had been and what he had done, etc. One of the plaintiffs in error was at the time connected with the Union. If they had not been satisfied with him and had not thought that he would be a fair juror they could have then gone into the matter further. We think there is no showing of propter affectum, that the juror was a biased on prejudiced juror. Reading his testimony convinces us, as it did the trial court, that he was fair.

 It is assigned as error that the manager of the local Hotel in Knoxville, accompanied by a law enforcement officer, searched the Hotel room occupied by the plaintiff in error Smith, and on this search found certain things, that is, they searched it the day after this shooting in 1955 and found from certain information that they found that things in his room, his coat pocket and a traffic ticket, etc., that the name instead of the assumed name given was that of W. A. Smith; that this was violating his constitutional rights in searching his room without a search warrant. We do not think so because any evidence that they secured was purely for the purpose of ascertaining whether or not the person under the assumed name was that of Smith. In view of the fact

that he (Smith) admitted on the witness stand that he did occupy that room and cited his reasons of why he occupied it under an assumed name (to have women with him) that this assignment of error is of no weight. It is consequently overruled.

▉ In the outset, and to lay the ground for this conspiracy, evidence was introduced of a strike in progress between the labor union and the motor lines. One of the plaintiffs in error was assistant business agent of this labor union at that time. It is said that some of these things shown in the beginning about the contacts with Smith and the head of this labor union, etc., were entirely unrelated to the defense herein and that they were introduced to show purely that the plaintiff in error Smith was a vicious person. We think that this evidence was admissible for showing a motive for this offense. The fact is when you read this record it all fits and ties in so that it takes this to fill out a complete picture of the situation. By reference to Wharton's Criminal Evidence, supra, situations of the kind have been held legal. As far as we can find there are none to the contrary. This will be seen by reading the complete section that we cited in Wharton's Criminal Evidence, supra.

▉ It is ably argued, and assigned as error, that it was reversible error because the State was allowed to show in rebuttal that one of their witnesses, the witness Freels, had a good reputation for truth, veracity and chastity. This was, we think, very proper rebuttal evidence to meet the bias and prejudice of this witness which was introduced by the plaintiffs in error when they attempted to show that this witness was a common prostitute who had defaulted with the funds of the union, etc.,

and that she was the aggressor in an illicit relationship with the plaintiff in error Reynolds. Clearly when the plaintiffs in error attempted to show that she was this character of a woman it was entirely proper for the State to rebut this by showing to the contrary. This purely and simply left a question of fact for the jury to determine. Along the line, in supporting what we have said, see *People v. Perez,* 128 Cal.App.2d 750, 276 P.2d 72, and *Bracey v. United States,* 79 U.S.App.D.C. 23, 142 F.2d 85.

On direct examination the State in proving its case offered as a witness the president of the B & S Motor Lines. This witness apparently had a little book in which he had quite a number of notes from which he testified as to certain times and places and figures, and what was said and what not, by reading or referring to these notes. This was objected to and the court allowed the witness to refresh his recollection from these notes. Then when counsel for the plaintiffs in error took him on cross examination he desired to have this book and read the notes himself. At first the trial judge would not allow counsel for the plaintiffs in error to read and examine these notes. At a later time, after lunch, the trial judge concluded that he had made an error in not allowing these notes to be inspected by counsel for the plaintiffs in error. He changed his ruling and then allowed this inspection by counsel for plaintiffs in error. It is argued that this is error because there is a period of time of disconnection between the cross examination on his first cross examination and when he was allowed to see the notes and then examine them.

We do not think this error because if it had been error in the first instance it certainly would have been harm-

less and this was cured by the later allowing counsel to examine these notes and look at them. After two years time it was natural for anyone when they know they are going to be put on the witness stand to sit down and think about the matter and jot down notes before they got on the witness stand so that they could refresh their recollection from them. It is pretty hard for even those that are experienced to sit on the stand and recall things that happened two or three years before if they had not had an opportunity to think about them and jot it down.

Another argument, in this assignment of error as to the testimony of this witness, was that the trial judge commented on the weight of the evidence. The situation in this regard really does not amount to a comment on the evidence under our constitutional guaranty of such. Here is what happened: This witness was asked to explain to the jury what he meant by the term "independent contractors". He had testified on direct examination that these truck bodies contained freight that he was hauling; that these bodies had the names (B & S Lines) on them, but that as far as the actual operation, that is, the cab and the motor that pull these trucks was let out to independent contractors. It was these independent contractors who were pulling the truck at the time this shooting happened. When this was objected to he attempted to explain to the jury what he meant by independent contractors. The trial judge, in effect, sustained the objection and stated that it was not particularly important for the jury to know the definition of an independent contractor, that the main thing the jury should know was whether or not there was a labor dispute affecting these motor lines. We think that this clearly is not a comment on the weight of the evidence in

such a way that would at all violate any right of these parties. It was just the natural comment and not one that is at all injurious. It is not in the sense of telling the jury that such and such is a fact and that such and such is not a fact or what is and what not. We think that this assignment is wholly without merit.

During the trial of the case two witnesses were called by the State who were members of the Teamsters' Union. Apparently these witnesses were very hesitant and the State had information or had been given statements prior to this hearing contrary to what they attempted to say on this trial. Objection was made then to the apparent cross examination or what amounted to that by the District Attorney General of his own witness. On this being done the jury was excused. While the jury was out the trial judge in effect lectured each of these witnesses and told them that all they were there for was to tell the truth and the whole truth and nothing but the truth, and he did not want any equivocation out of them and if there was any perjury in there they were going to be punished for perjury, etc. These statements of the trial judge were made out of the presence of the jury. There certainly can be no error in this. This question is interestingly discussed in 53 Am.Jur., Sec. 22, page 40. The paragraph ends with this statement:

"In any event, the commitment of a witness is not prejudicial where it is made without the knowledge of the jury; and does not have the effect of intimidating the witness."

Our reading of this record convinces us that the statements of the trial judge to these witnesses at the time he made them were warranted. They were not made before

542

the jury and later on when the trial judge was not sure whether or not the statement to one of the witnesses had been made before the jury he properly instructed the jury that they were not to consider what he had said to this witness or regard it for any reason at all. This, if it had been a misadventure at the time that it was made (if it had been made before the jury) certainly is not prejudicial error and under the Harmless Error Statute (section 27-117, T.C.A.), would not be erroneous.

Reading this record one finds that after all this skirmish between counsel for the State and counsel for the plaintiffs in error, and argument to the Court over trying to elicit certain evidence from the owner of the car that Smith had driven from Nashville to Knoxville (the witness apparently trying to evade it in every way possible), ended up by a stipulation that he did own the car, its color, the time that it was bought and its license number, etc.

It is assigned as error that the trial judge erred in refusing or in failing to instruct the jury on lesser included offenses embraced in the offense charged by the indictment. We think that it would have been error probably if he had instructed the jury on a lesser included offense under this and that certainly there is no error to not do so. A lesser included offense would have been barred by Section 40-205, T.C.A., as these charges happened more than 2 years before the indictment was found. If they had been convicted on a lesser included offense they would be entitled to be discharged. *Wilson v. State,* 15 Tenn. 516; *Hickey v. State,* 131 Tenn. 112, 174 S.W. 269.

The jury was instructed regarding such an offense in the Fifth Count of the indictment, and the jury did not fix the plaintiffs in error's punishment at a fine and jail sentence as it could have done 'under the instructions given by the court on the Fifth Count if the jury had been so inclined. They found for the plaintiffs in error under the Fifth Count in which they were instructed on the lesser offense. Furthermore from reading this record the evidence is absolutely overwhelming and preponderates in favor of the guilt of the greater offenses.

The full argument of the District Attorney General as was made to the jury is contained in one small volume among the volumes of this record. The plaintiffs in error complain as to portions of this argument. They assign it as error wherein the District Attorney General argued that if they found the plaintiffs in error not guilty and turned them loose that they would be branding a woman witness who testified against one of them as a whore. This is not error because that is exactly what the plaintiffs in error attempted to do in their testimony about this woman. There is certainly ample proof in the record, what the plaintiffs in error said themselves, that entitled this to be argued and answered by the District Attorney General. Complaint is also made along this line that the District Attorney General argued in effect and contended in his argument that the plaintiffs in error were criminals and gangsters. This argument was warranted by the evidence, if for nothing more was warranted under the voluntary statement made by the plaintiff in error Smith that he had been so branded over a period of time. Arguments of the kind were not prejudicial or intemporate but were warranted from the facts and circumstances of the case. When such is true certainly the

District Attorney General cannot be censured for arguing the facts as he saw them.

After having spent, uninterruptedly, more than one week in reading this record, the authorities and thinking about it pro and con between times as one must, we are convinced that the plaintiffs in error had a fair trial and that the evidence adduced herein clearly shows their guilt. We can find no error in the record and it is for the reasons herein expressed that the judgment below must be affirmed.

It is with apology that we have had to write such a long opinion to cover all the serious contentions that this large record warrants. Judgement is affirmed.

## On Petition to Rehear

Counsel for the plaintiffs in error have filed a dignified and respectful petition to rehear in this cause. The basis of this petition is purely a re-argument of what was heretofore forcefully and ably argued at the Bar of this Court and in the briefs originally filed. Primarily this petition is based upon the fact that some of the jurors (quoting again in the petition to rehear the evidence of certain of the jurors which was quoted in the original brief) had an opportunity and did read certain newspaper reports published during the trial of the cause.

We gave this and all questions raised in this petition very serious and careful study, and thought, before preparing our original opinion. It is true we did not take up each of these specific items as argued because in our judgment they were all covered by what we said in our opinion specifically from pages 16 to 24 [327 S.W.2d 319 to 323]. We did not overlook any of these things and

were clearly convinced that the questions raised were not prejudicial to the plaintiffs in error for the reasons therein stated.

Some additional authorities in support of these contentions are now cited, one in particular is *Marshall v United ed States,* 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250. We had read the advance opinion before releasing our opinion but did not mention it in the opinion because the opinion had been prepared prior to our receipt of this opinion. This opinion recognizes that in such matters as here presented the trial judge has a very large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial. The Court cites *Holt v. United States,* 218 U.S. 245, 251, 31 S.Ct. 2, 54 L.Ed. 1021, as its authority for this recognition. The Holt case was read by us prior to our preparation of the original opinion. We for the reasons expressed in our opinion held that there was no abuse of discretion of the trial judge in his action herein and further held by reason of the proof offered on the motion for a new trial that there was no prejudice, in our judgment, to the plaintiffs in error by reason of these facts. The Marshall case is really authority for nothing more than that the Supreme Court of the United States says:

"In the exercise of our supervisory power to formulate and apply proper standards for enforcement of the criminal law in the federal courts (*Bruno v. United States,* 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257; *McNabb v. United States,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819) we think a new trial should be granted." [360 U.S. 310, 79 S.Ct. 1173.]

This Court likewise recognizes a supervisory power over trial courts in the interest of fairness and justice to defendants who are there tried. In exercising this thought and jurisdiction we concluded under this record that there was no error herein.

We are firmly convinced that there is no violation of the right of due process of law as guaranteed by the Fourteenth Amendment of the Constitution of the United States or of Article 1 of the Constitution of Tennessee to these defendants.

For the reasons herein stated, the petition to rehear is accordingly denied.