IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 3, 2023

**STATE OF TENNESSEE v. DARIOUS GORY**

**Appeal from the Criminal Court for Shelby County**
**No. 20-02078, C2003558   Chris Craft, Judge**

_____

**No. W2023-00062-CCA-R3-CD**

_____

A Shelby County jury convicted the defendant of rape of a child for which he received a sentence of 60 years' confinement as a career offender. On appeal, the defendant claims the trial court erred in allowing the State, over the defendant's objection, to dismiss the second count of the indictment, aggravated sexual battery, at the close of its proof. Additionally, the defendant asserts that the demonstrative aid used by the prosecutor during jury voir dire constituted misconduct. The State insists that "it is within the State's prerogative" to dismiss count two and that by failing to object, the defendant has waived his claim relating to the State's voir dire. Upon our review of the record, the applicable law, and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and ROBERT H. MONTGOMERY, Jr., J., joined.

Claiborne H. Ferguson and Matthew Blissitt, Memphis, Tennessee, for the appellant, Darious Gory.

Jonathan Skrmetti, Attorney General and Reporter; Katherine K. Decker, Senior Assistant Attorney General; Steve Mulroy, District Attorney General; and Jose F. Leon and Dru Carpenter, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

The defendant was charged in a two-count indictment with rape of a child and aggravated sexual battery, arising out of an incident against his nine-year-old second cousin in March 2020.

## I.     Jury Voir Dire

During the State's voir dire of the potential jurors, the State asked a prospective juror what came to mind when he heard the word "rape." In response, the juror stated, "Force." The State then followed-up by asking, "Do you expect to see injuries? Do you expect to see a lot of blood? . . . Some people think of rape in one way and some people think of rape in a different way and those are a few misconceptions and things that I want to get out in front of you, okay?" In response to the State's questions and comments, a second potential jury responded, "Aggression," to which the the prosecutor asked if he would expect to see bruises and, for anal rape, tears of the anus. In response, a third prospective juror answered yes to both.

The prosecutor then asked, "If it was vaginal rape, would you expect to see vaginal tears and vaginal injuries and all of that? . . . [C]an someone be raped and not present all of those injuries or all of that force?" When a prospective juror suggested that "[s]ome of them just give in," the prosecutor asked, "What if it's opposed to . . . . What if the penetration was done with something small as opposed to something big?" The prosecutor then used a cup and pen as a demonstrative aid while explaining:

> Here's where I'm going—and this is graphic but I'm going to show you. So imagine that this [cup] is the—this [cup] is the–the body part, right? If you go with my fist, I'm probably going to tear the [cup], right? We all agree on that? Really, it's just physics, right? I'm going to tear this cup but if I put my pen in, am I going to tear the cup?

In response to the State's illustration and statements, one prospective juror answered no and another said he understood what the prosecutor was saying. The State further explained that in order to find the defendant guilty, the law does not require the victim suffer an injury. More specifically, the State noted,

> It has to be unlawful penetration . . . and the cup, I guess that's the best way of explaining it. I mean, if I put my hand through this cup, I'll tear it. Just, that easy, right, because [my hand] is bigger than this [cup]. But if I put my pen, it's still going in the cup, right? And the . . . pen is in this cup but there's no tear, there's no damage, there's no nothing. I want you to start thinking about those—some of those things that Judge Craft is going to talk to you about, okay? And that's why I brought that example up.

As the State continued to voir dire prospective jurors, the State again referenced the earlier juror who had an expectation that there would be injuries or tears associated with a rape, and the following exchange then occurred:

[State]: What if I told you there was no injuries? Would that affect [you] one way or another?
Prospective Juror: No.
[State]: What if I told you there was or there was not semen?
Prospective Juror: No.
[State]: Would it affect you if I told you there was or there wasn't any injuries?
Prospective Juror: No.

The State then reminded the additional prospective jurors of its earlier demonstration and asked if the pen could be inserted into the cup without it being torn:

[State]: Remember the example I used last time?
Prospective Juror: The cup and the pen.
[State]: About the cup and the pen. How if I push my fist through this [cup] I'll break it but if I put a pen, I mean, it's still inside the cup, right?
Prospective Juror: Uh-huh.
[State]: And I'm not tearing the cup. I guess the question I'm asking is sort of like what I told you in the instructions, it's the unlawful sexual penetration of the alleged victim for purposes of, like, it's not even touching. But is this not inserted in this cup?

## II.     Proof at Trial

The State's proof at trial showed that the victim, who was nine years old at the time, went to her great-grandmother's house on the night of March 27, 2020, to spend the night. The victim's younger sister, two younger cousins, and several adult family members and family friends were also there that night. Among the adults present were Jeremy Childs and Christopher "Bull" McGee, as well as the defendant, who was thirty-one years old and the victim's second cousin.

The victim and other children were hanging out in "Uncle Marlon's" bedroom. At some point, "Uncle Marlon" came into the room to go to sleep, and he and the other children fell asleep in his bed. The victim moved to the foot of the bed and played a game on her tablet until the battery died. Around 3:00 a.m., the defendant came into the room and asked the victim if she wanted to play on his phone. The victim said "yes," and the

defendant gave the victim his phone and got into the bed with her.  The defendant asked the victim questions while she played a game on his phone and then pulled her underwear down and "started to touch [her]."  The defendant "put his finger in [the victim's] vagina and kissed [her] on the lips."  The victim felt "[u]ncomfortable" when the defendant put his finger in her vagina, and she started to cry.  The victim tried to fight the defendant's hand, "but his hand won."  The victim, however, did not scream because she was scared.  The defendant stopped when an adult the victim knew as "Bull" came into the room to get tissues.  When "Bull" entered the room, the defendant "jumped back out [of] the bed and he pretended not to know what happened."

The victim told "Bull" and Mr. Childs that the defendant kissed her and touched her, but she did not use the words penetrate or vagina.  "Bull" was deceased at the time of trial, but Mr. Childs testified that he was alerted that something had happened in the back bedroom and went to investigate.  Mr. Childs found the victim "tragically crying" and "hysterical."  After the incident was reported to the police, the victim identified the defendant from a photographic array and on which she wrote:  "He kissed me on my lips and pulled my underwear down and he put his hand in my private part."  Mr. Childs also identified the defendant from a photographic array and noted on the array that "[The victim] told me he molested her while everyone was [a]sleep."

The victim's mother learned of the incident when someone called her around 6:00 a.m. saying the victim was crying and hysterical.  The victim's mother went to the home, and the victim told her that the defendant touched her on and inside her vagina.  The victim's mother had never seen the victim so upset before.  The victim's mother noted that the victim had become timid and scared "of everything and everyone" since the rape.  The victim's mother also recounted that the victim was wearing a dress when she was raped and has refused to wear a dress again since that night.

Later that morning, the victim was taken to the rape crisis center where she reported to a nurse examiner at the rape crisis center that "something bad happened" to her.  The victim elaborated that the defendant came into the room, asked if she wanted to see his phone, and started kissing her on the lips and hugging her.  The defendant pulled down the victim's underwear and touched her between the legs and "put his fingers inside."  The victim reported that she was crying, and the defendant apologized and asked what he could do to make her forgive him.  The victim told the examiner "it hurt down there after he did it."  Although a physical examination did not reveal evidence of genital injury, the examiner said such finding was not unusual for the type of penetration alleged.  The victim similarly recounted the incident to the officer who responded to the scene, the officer who met with her at the rape crisis center, and a forensic interviewer at the child advocacy center.

- 4 -

Forensic analysis of vulvar swabs taken from the victim's sexual assault kit revealed the presence of male DNA, consistent with the victim's report of digital touching and penetration of her vagina by a male. In addition, a Y-STR DNA profile from a swab of the victim's lips was consistent with buccal swabs taken from the defendant, supporting the victim's account that the defendant kissed her on the lips.

At the conclusion of the State's proof, the prosecutor announced that, "based on the way the proof came out and how the indictment was written," it planned to dismiss count two. The defendant objected to the State's taking such action in the middle of trial, asserting the case should go to the jury as indicted. The trial court responded that it could not disallow the State from doing so and offered that it would explain to the jury that count two was a lesser-included offense of count one which would implicate double jeopardy if the defendant were convicted on both counts.

Later, when charging the jury with the applicable law, the trial court explained:

> Now count two charges aggravated sexual battery but it's also one of the lesser[-]included offenses in count one. And there's only one incident of any sexual contact or anything mentioned in the proof so for that reason, the State has dismissed count two so all we're going to be considering is count one as far as the proof in the case.

The jury convicted the defendant of rape of a child, and, following a sentencing hearing, the trial court imposed a sentence of 60 years' confinement as a career offender. This timely appeal followed.

### *Analysis*

## I.  Indictment

The defendant argues that the trial court erred in allowing the State to dismiss the second count of the indictment over his objection. The defendant asserts that the dismissal was an amendment to the indictment that did not comply with the procedural requirements of Tennessee Rule of Criminal Procedure 7(b)(2) and that the timing of which "became a source of steep prejudice" against him and deprived him of an impartial jury and fair trial. Alternatively, the defendant contends that the dismissal of count two was essentially a severance of mandatorily joined offenses that did not follow the proper procedure found in Tennessee Rule of Criminal Procedure 14(b)(2)(B) because he did not consent. The State responds that "it was within the State's prerogative to dismiss Count 2," that neither of the rules relied on by the defendant apply to dismissing a count of an indictment, and the

defendant's right to an impartial jury was not violated and his trial was not unfair. We agree with the State.

Tennessee Rule of Criminal Procedure 7(b) governs the amendment of indictments. An indictment can be amended pursuant to Rule 7(b)(1) if the defendant consents to the amendment. Tenn. R. Crim. P. 7(b)(1); *State v. Stokes*, 24 S.W.3d 303, 307 (Tenn. 2000). Pursuant to Rule 7(b)(2), a trial court may allow an indictment to be amended without the defendant's consent, before jeopardy attaches, "if no additional or different offense is charged and no substantial right of the defendant is prejudiced." Tenn. R. Crim. P. 7(b)(2).

Clearly, the defendant did not consent to any amendment and jeopardy had attached. However, Rule 7 does not apply to the dismissal of count two because the removal was just a narrowing of the indictment and "removal of one of the charged offenses from the jury does not operate as an impermissible amendment to the indictment." *State v. Lindsey*, 208 S.W.3d 432, 441 (Tenn. Crim. App. 2006) (citing *United States v. Miller*, 471 U.S. 130, 145 (1985). As the Supreme Court noted in *Miller*, "where an indictment charges several offenses, or the commission of one offense in several ways, the withdrawal from the jury's consideration of one offense or one alleged method of committing it does not constitute a forbidden amendment of the indictment." *See Miller*, 471 U.S. at 145. *See also Salinger v. United States,* 272 U.S. 542, 548-49 (1926) (Removal of all counts but one from the jury did not add anything to the indictment that was not charged and "was not even remotely an infraction" of the constitutional guarantee of indictment by the grand jury.)

The defendant acknowledges this precedent but asserts his case is different because he is not claiming that the dismissal resulted in the deprivation of his right "to be tried only on charges presented in an indictment returned by a grand jury" but instead that the dismissal "materially impacted the impartiality of the jury and the fairness of his trial." In the defendant's view, the "last-minute . . . altering [of] the indictment at the conclusion of the proof, curtailed any hope of an impartial jury[.]" The defendant expounds that "the altered indictment forced the jury to infer that they could either convict [him] of Rape of a Child or convict him of nothing at all."

A defendant's right to an impartial jury is guaranteed by both the United States and the Tennessee Constitutions. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. "'The impartial jury guaranteed by constitutional provisions is one which is of impartial frame of mind at the beginning of trial, is influenced only by legal and competent evidence produced during trial, and bases its verdict upon evidence connecting defendant with the commission of the crime charged.'" *State v. Hugueley*, 185 S.W. 3d 356, 377-78 (Tenn. 2006) (quoting *State v. Lawson*, 794 S.W.2d 363, 367 (Tenn. Crim. App. 1990)). There is simply no proof, only speculation, that the jury was somehow made impartial by the State's dismissal of count two.

Likewise, there is no evidence that the fairness of the defendant's trial was affected by the dismissal of count two. The trial court explicitly instructed the jury that the reason for the dismissal was because the evidence only established one incident of sexual contact and that it could consider the offense of aggravated sexual battery as a lesser-included offense if it found the defendant not guilty of rape of a child. We presume the jury followed the trial court's instructions. *State v. Shaw*, 37 S.W.3d 900, 904 (Tenn. 2001); *State v. Starner*, No. M2014-01690-CCA-R3-CD, 2016 WL 1620778, at *21 (Tenn. Crim. App. Apr. 20, 2016) (citing *State v. Young*, 196 S.W.3d 85, 111 (Tenn. 2006)). The dismissal of count two did not render the defendant's trial unfair.

We turn now to the defendant's argument that the trial court erred in failing to comply with Tennessee Rule of Criminal Procedure 14(b)(2)(B) regarding severance of offenses that have been joined mandatorily when it dismissed count two without his consent. The applicable rule provides that the trial court shall grant a severance of such offenses "[d]uring trial, with consent of the defendant, when the court finds a severance is necessary to achieve a fair determination of the defendant's guilt or innocence of each offense." *Id.* However, this rule is not applicable because count two was dismissed, not severed for separate determination.

As to the defendant's suggestion that "[t]here was nothing to gain from Count 2's dismissal" because the merger doctrine would have precluded any potential double jeopardy issues had he been convicted on both counts, even if true, it was still within the State's prerogative to dismiss the count.

## II.     Prosecutorial Misconduct

The defendant also argues that the prosecutor's use of a cup and pen as a demonstrative aid during jury voir dire constituted misconduct. He posits that the prosecutor's "lewd gestures" were irrelevant to the facts of the case and "led to prejudice before the jury was even selected." The defendant acknowledges that he did not make a contemporaneous objection but asks this Court to review the issue for plain error.

We may consider an issue to be plain error when all five of the following factors are met: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice." *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); *see also State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the *Adkisson* test for determining plain error). "[A]ll five factors must be established by the record before this

Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Smith*, 24 S.W.3d at 283. "Moreover, the error must have been of 'sufficient magnitude that it probably changed the outcome of the trial.'" *State v. Vance*, 596 S.W.3d 229, 254 (Tenn. 2020) (quoting *State v. Banks*, 271 S.W.3d 90, 119 (Tenn. 2008)). We conclude that the complained-of conduct does not rise to the level of plain error, as there was no breach of a clear and unequivocal rule of law, no substantial right of the defendant was affected, and consideration of the alleged error is not necessary to do substantial justice.

At the motion for new trial, the prosecutor explained the reason for his demonstration, stating:

> The State of Tennessee was merely attempting to get jurors to start thinking that just because there was no injury, it doesn't mean that it didn't happen. The correlation between force and the small genital area of a female. That's why that explanation was used, to show that [injury] wasn't required. To show that it wasn't unnecessarily what's expected to happen physically.
>
> And as a matter of fact, to back that up, the nurse practitioner, who examined [the victim], explained that in cases like the one we had, we don't necessarily see injury. So, it was the explanation that the State did to show to the jury that they don't -- it doesn't have to be that when they imagined rapes, they imagined a violent act. And the ripping of the cup was what . . . some of them had that conception that there had to be some kind of . . . tear or damage to the genital parts of the victim. And the State of Tennessee merely tried to demonstrate that. That was not the testimony at trial. There was merely a -- the State of Tennessee seeking to explain to the jury kind of what the case in front of them was going to be.

As noted *supra*, in order to conduct plain error review all five factors must be established, including that the record must clearly establish what occurred in the trial court. *Adkisson*, 899 S.W.2d at 641-42. Here, despite the defendant's description and argument, it is not abundantly clear what happened during voir dire. While the defendant claims the prosecutor physically tore the cup with his fist, a reading of the transcript neither establishes or disproves that fact. During his questioning of the jury and discussion of his cup, fist, and pen analogy, the prosecutor used the following language:

> If you go with my fist, I'm probably going to tear the [cup], right? We all agree on that? Really, it's just physics, right? I'm going to tear this cup but if I put my pen in, am I going to tear the cup?

. . . .
I mean, if I put my hand through this cup, I'll tear it. Just, that easy, right, because [my hand] is bigger than this [cup]. But if I put my pen, it's still going in the cup, right? And the . . . pen is in this cup but there's no tear, there's no damage, there's no nothing.

Our reading of the language used by the prosecutor is language of supposition and a conditional clause. The transcript does not support the defendant's claim that the prosecutor did, in fact, place his fist in the cup and tear the cup. Accordingly, it is unclear from the record before us as to what took place during voir dire. To be clear, we are not concluding that the act complained of did or did not happen and would note that if it were clear that the act did occur the analysis might be different; however, based on the record before us, we cannot with any level of reasonable certainty determine what occurred at the trial level. Therefore, the defendant has not established the first requirement for plain error review.

Regardless of the clarity, or lack thereof, of the record, the defendant has failed to establish that the State's demonstration affected the outcome of his trial. "A voir dire examination is for the purpose of advising counsel of the juror's qualification, interest, or bias . . . [and] [t]he subjacent purpose is to enable the exercise of one's peremptory challenges." *Smith v. State*, 327 S.W.2d 308, 318 (1959). A juror's belief that the victim would have sustained physical injuries if raped was a bias or misconception that the prosecutor's demonstration aimed to dispel and could have led to the exercise of a peremptory challenge to any juror who did not appear to accept such distinction. Moreover, there was abundant proof that the defendant committed rape of a child by inserting his finger into the victim's vagina, and it was that proof that led to his conviction, not the prosecutor's demonstration during voir dire. Also, as noted above, while the record reveals that the prosecutor talked about what would happen if he put his hand in the cup, there is no proof in the record that the prosecutor actually placed his hand in the cup and caused the "damage" discussed. Accordingly, the defendant's claim that the demonstration somehow created a visual that was violent and prejudicial is not supported by the record. The defendant has failed to establish that the State's demonstration probably affected the outcome of the trial. Furthermore, while the defendant argues he is entitled to relief under the five factors considered when measuring the prejudicial impact of alleged prosecutorial misconduct, he fails to address how he is entitled to relief under the factors of plain error review. The defendant is not entitled to relief.

### *Conclusion*

Based on the forgoing authorities and reasoning, we affirm the judgment of the trial court.

_____
J. ROSS DYER, JUDGE